## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Associated Builders and Contractors, Inc., Minnesota/North Dakota Chapter; and Laketown Electric Corporation,

                    Plaintiffs,

v.

Minneapolis Public Schools, Special School District No. 1; and Nelson Inz, in his official capacity as Chairperson of the Minneapolis Board of Education,

                    Defendants,

and

Minneapolis Building and Construction Trades Council,

                    Defendant-Intervenor.

Case File No.: 0:19-cv-00656 (DWF/BRT)

**MEMORANDUM OF LAW OF DEFENDANT-INTERVENOR MINNEAPOLIS BUILDING AND CONSTRUCTION TRADES COUNCIL IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

**ORAL ARGUMENT REQUESTED**

---

Dated:  May 23, 2019

**CUMMINS & CUMMINS, LLP**

*/s/ Brendan D. Cummins*
Brendan D. Cummins, # 276236
Alex M. Bollman, # 400007
1245 International Centre
920 Second Avenue South
Minneapolis, MN 55402
612.465.0108
brendan@cummins-law.com
alex@cummins-law.com

**ATTORNEYS FOR DEFENDANT-INTERVENOR MINNEAPOLIS BUILDING AND CONSTRUCTION TRADES COUNCIL**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 1

MATERIAL COMPLAINT ALLEGATIONS AND DOCUMENTS AND LAW
INCORPORATED THEREIN ............................................................. 2

    I.     The Project Labor Agreement ......................................... 2

    II.    Non-Union Contractors Can And Do Work Under The PLA, And The
          PLA's Hiring Procedures Do Not Require Non-Union Employers
          To Become Union Contractors ......................................... 4

    III.   The PLA's Hiring Procedures Do Not Require Employees To Be Union
          Members ................................................................... 5

    IV.   The PLA's Fringe Benefits Provision Plainly States That It Only
          Requires Contributions For Bona Fide Employee Benefits That Accrue
          Directly To The Employee ............................................... 7

    V.    Plaintiff Laketown Admittedly Has Not Bid On Any Work
          Under The PLA, And Plaintiff ABC's Members Have Been Awarded
          Work Under The PLA .................................................... 7

ARGUMENT ...................................................................................... 8

    I.     LEGAL STANDARD ...................................................... 8

    II.    BINDING SUPREME COURT AND EIGHTH CIRCUIT PRECEDENT
          FORECLOSES PLAINTIFF'S FIRST AMENDMENT CLAIMS
          CHALLENGING THE PLA'S HIRING PROCEDURES ............ 9

          A.   Supreme Court Authority Bars Plaintiffs' Freedom of Association
                Claim Because Hiring Construction Workers Is Not An "Expressive
                Association" .......................................................... 9

          B.   Eighth Circuit Authority Precludes Plaintiffs' Claim Because Any
                Incidental Impact On Plaintiffs' Freedom Of Association Due To
                The PLA's Hiring Procedures Would Be Justified By A Rational
                Basis ................................................................ 11

i

C.     Supreme Court And Eighth Circuit Authority Forecloses Plaintiffs' Free Speech Claim Because the PLA Does Not Discriminate Against Their Non-Union "Viewpoint," And The PLA Would Not Require Plaintiffs To Host Or Accommodate A Pro-Union Message ................................................................................. 17

D.     Plaintiffs' Efforts to Distinguish *Hanten* Are Unavailing ................... 19

E.     *Janus* Applies To Public Sector Agency Fees, Not Private Sector Hiring Procedures ................................................................. 19

III.    CLEARLY ESTABLISHED PRECEDENT OF THE EIGHTH CIRCUIT AND OTHER COURTS BARS PLAINTIFFS' EQUAL PROTECTION CLAIM BECAUSE THE PLA DOES NOT DISCRIMINATE AGAINST PLAINTIFFS AND, IN ANY EVENT, IT IS SUPPORTED BY A RATIONAL BASIS ................................................................. 20

IV.    CLEARLY ESTABLISHED EIGHTH CIRCUIT AUTHORITY PRECLUDES PLAINTIFFS' DUE PROCESS CLAIM BECAUSE PLAINTIFFS HAVE NO PROPERTY OR LIBERTY INTEREST AT STAKE ................................................................................ 22

V.    PLAINTIFFS' FIRST AMENDMENT CLAIM CHALLENGING THE PLA'S FRINGE BENEFITS PROVISION IS BASELESS BECAUSE THE PLA CLEARLY STATES THAT EMPLOYERS ARE ONLY REQUIRED TO PAY FOR BONA FIDE BENEFITS THAT ACCRUE DIRECTLY TO THE EMPLOYEE ......................................................... 24

VI.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS BECAUSE THEY HAVE SUFFERED NO INJURY-IN-FACT ................... 26

A.     Laketown Lacks Standing Because It Has Suffered No Injury-In-Fact ................................................................................ 26

B.     The ABC Lacks Organizational Standing Because It Has Not Suffered Any Injury-In-Fact ............................................. 27

C.     The ABC Lacks Standing To Sue On Behalf Of Its Members ........... 29

D.     Plaintiffs Lack Standing To Assert Claims On Behalf Of Third-Party Employees ....................................................... 29

CONCLUSION ................................................................................ 30

## INTRODUCTION

Defendant-Intervenor Minneapolis Building and Construction Trades Council ("Council") submits this Memorandum in support of its Motion to Dismiss the Complaint in the above matter pursuant to Fed.R.Civ.P. 12(b)(1) & 12(b)(6).

This is a test case brought by anti-union organizations seeking to overturn longstanding precedent. Plaintiffs challenge the hiring procedures and employee benefit provisions of a Project Labor Agreement ("PLA") between the Council and the Minneapolis Public Schools. Under established Eighth Circuit precedent, a school district's requirement that its construction contractors utilize collectively bargained hiring procedures to supply labor on its projects does not violate the First or Fourteenth Amendments. *See Hanten v. School Dist. of Riverview Gardens*, 183 F.3d 799, 805-09 (8th Cir. 1999). The hiring of construction workers by private businesses is not an "expressive association" that warrants First Amendment protection. In addition, the PLA's requirement of contributing to jointly administered employee benefit funds has nothing whatsoever to do with political spending or "union speech" and thus does not violate the First Amendment.

In this case, Plaintiffs are asserting a sweeping new constitutional right of private employers not to associate with unions or their members because of their anti-union "merit shop philosophy" which, if taken to its logical conclusion, would nullify the National Labor Relations Act ("NLRA"). This new legal theory has no support in the Constitution or the case law.

1

In any event, Plaintiffs lack standing to pursue their purported claims because they have suffered no injury-in-fact.  Plaintiff Laketown Electric Corporation admittedly is "willing and able" but has failed to bid on work under the PLA.  *Compl. ¶11.*  Thus, any alleged injury is hypothetical and not concrete or particularized as required by Article III. Moreover, the alleged injury to Plaintiff Associated Builders and Contractors, Inc., Minnesota/North Dakota Chapter ("ABC") of frustration of their mission "to promote and defend the merit shop philosophy" is likewise abstract and not concrete, and regardless ABC members have successfully bid on and been awarded work under the PLA.  *Compl. ¶3.*  Accordingly, Plaintiffs lack Article III standing.

For these reasons, the Complaint should be dismissed in its entirety and with prejudice.

## MATERIAL COMPLAINT ALLEGATIONS AND DOCUMENTS AND LAW INCORPORATED THEREIN

### I.     The Project Labor Agreement

Defendant Minneapolis Public Schools, Special School District No. 1 ("School District") is party to a project labor agreement ("Minneapolis Schools PLA" or "PLA") with Defendant-Intervenor Minneapolis Building and Construction Trades Council ("Council" or "Unions" or "Union").  *Compl., ¶24, Ex.A, ECF Doc. 1-1, pp.35-48 (hereafter "PLA").*  The Council is an unincorporated labor organization that advocates on behalf of its affiliated construction craft unions and approximately 15,000 construction workers represented by those unions in Minneapolis and surrounding areas.  *Affidavit of Dan McConnell dated May 21, 2019 ("McConnell Aff."), ¶2.*

2

The Council negotiated and entered into the PLA on its own behalf and as the representative of its affiliated Unions. *PLA, Art.I.* The PLA applies to "the construction of the Alternative Facilities Bonding and Levy Program, (AFBLP) and District Identified Construction Program (DICP)." *Id.* As stated in the PLA, its purposes include providing for workplace harmony at construction sites and preventing work stoppages to ensure prompt and economical completion of projects and supplying "substantial numbers of employees from construction and supporting crafts, possessing skills and qualifications that are vital to [the Project's] completion." *Id.*

A PLA is a form of prehire collective bargaining agreement that is used commonly and exclusively in the construction industry and is authorized by section 8(f) of the NLRA. *See Building and Constr. Trades Council v. Associated Builders and Contractors of Mass./R.I., Inc.* ["*Boston Harbor*"], 507 U.S. 218, 230 (1993). Prehire agreements are collective bargaining agreements that provide for, among other things, the use of union hiring halls prior to the hiring of employees. *Id.* A PLA is a prehire agreement that applies to multiple employers on project sites. *Id., Compl. ¶¶15-20.* A PLA requires that all contractors performing work on project sites must become bound by the terms of that labor agreement. *Boston Harbor*, 507 U.S. at 230. According to the Supreme Court, the use of PLAs "promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry." *Id.*

Under a PLA, "both union and non-union contractors may bid for contracts, but all successful bidders must agree to abide by the terms of the PLA during the project." *Queen City Constr., Inc. v. City of Rochester*, 604 N.W.2d 368, 371 (Minn. Ct. App.

3

1999); *see also id.* at 376 ("a non-union contractor can in fact win a contract on a project for which a PLA is in place"). "The obligation to comply with the PLA (and its incorporated collective bargaining agreements) extends only to the particular project and only during that project." *Queen City*, 604 N.W.2d at 371.

Although Plaintiffs allege that PLAs supposedly increase project costs and decrease competition, academic studies and Minnesota case law indicate otherwise.[1]

## II. Non-Union Contractors Can And Do Work Under The PLA, And The PLA's Hiring Procedures Do Not Require Non-Union Employers To Become Union Contractors

The Minneapolis Schools PLA expressly states that bidding is open to contractors who are willing to abide by the PLA regardless of whether they are unionized or not:

---

[1] *See, e.g.,* Fred B. Kotler, Project Labor Agreements in New York State II: In the Public Interest and of Proven Value (Cornell University ILR School, 2011), https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1035&context=reports; Dale Belman and Matthew M. Bodah, Building Better: A Look at Best Practices for the Design of Project Labor Agreements (Economic Policy Institute Briefing Paper #274, Aug. 11, 2010), http://epi.3cdn.net/179fd74170130cd540_ibm6ib3kd.pdf; Dale Belman et al., Project Labor Agreements' Effect on School Construction Costs in Massachusetts, 49 Industrial Relations 44 (2010), https://msu.edu/~kenfrank/The%20Effect%20of%20Project%20Labor%20Agreements%20on%20the%20Cost%20of%20School%20Construction%20in%20Massachusetts.pdf; Kimberly Johnston-Dodds, Constructing California: A Review of Project Labor Agreements (California Research Bureau, California State Library, 2001), http://www.faircontracting.org/PDFs/project_labor_agreements/California-review-of-PLAs.pdf.; *see also* Dale Belman, Matthew M. Bodah & Peter Philips, Project Labor Agreements, ELECTRI International (2007), attached as Ex. 23 to McConnell Aff.; *Queen City*, 604 N.W.2d at 377. Although the question of the economic impact of PLAs is not relevant to Plaintiffs' claims, the Court may take judicial notice of these studies if it is inclined to evaluate whether Plaintiffs' allegation on this point is plausible.

4

> *The owner and/or the Project Contractor have the absolute right to select any qualified bidder for the award of Contractors on this Project, without reference to the existence or non-existence of any Agreements between such bidder and any party to this Agreement*; provided, however, only that such bidder is willing, ready and able to become a party to and comply with this Project Agreement, should it be designated the successful bidder.

*PLA, Art.II, Sec.4 (emphasis added).* The PLA underscores this point as follows:

> It is understood that this is a self-contained, standalone Agreement and that by virtue of having become bound to this Project Agreement, *neither the Project Contractor nor Contractors will be obligated to sign any other local area, or national Agreement*.

*PLA, Art.II, Sec.1 (emphasis added).* Thus, the PLA clearly states that successful bidders need not be or become union signatory contractors. Accordingly, it cannot plausibly be argued that the PLA's hiring provision somehow requires that a contractor be union or become unionized. In fact, non-union contractors regularly bid on and are awarded work under the PLA. *McConnell Aff., ¶5, Ex.24.*

### III.    The PLA's Hiring Procedures Do Not Require Employees To Be Union Members

The hiring provision in Article III, Section 2 of the Minneapolis Schools PLA provides that "the hiring of employees shall be governed by the procedures set forth in the Agreements set (sic) in Schedule A." Schedule A of the PLA incorporates by reference the hiring procedures contained in the collective bargaining agreements ("CBAs") of unions affiliated with the Council. *PLA, p.13*; *McConnell Aff., ¶3, Exs.1-22.*

Some of the applicable hiring procedures that are incorporated in the PLA are open, allowing Employers the option to hire employees from the union or other sources. *See, e.g. McConnell Aff., Ex.1, Art.6 (Bricklayers); Ex.2, Art.6 (Carpenters); Ex.3, Art.6*

5

*(Cement Masons); Ex.4, Art.XII (Plasterers); Ex.5, Art.I (Roofers); Ex.6, Art.14 (Sign Workers); Ex.7, Art.21 (Sprinklerfitters); Ex.8, Art.14 (Tile Layers).* Some of the CBAs do not contain local referral procedures at all, allowing the employer to hire employees from any source. *See, e.g., McConnell Aff., Ex.9 (Drywall Finishers); Ex.10 (Glaziers); Ex.11 (Insulators); Ex.12 (Painters).* Some of the hiring procedures in the CBAs establish an "exclusive hiring hall" arrangement whereby the Employer is required to hire employees referred by the union. *See, e.g. McConnell Aff., Ex.13, Art.6 (Boilermakers); Ex.14, Art.IV (Electricians); Ex.15, Art.IV (Electricians—Limited Energy); Ex.16, Art.XXII (Elevator Constructors); Ex.17, Art.6 (Iron Workers); Ex.18, Art.6 (Laborers and Plaster Tenders); Ex.19, Art.5 (Operating Engineers); Ex.20, Art.IV (Pipefitters); Ex.21, Art.IV (Plumbers); Ex.22, Art.III (Sheet Metal Workers).*

Consistent with the requirements of applicable law (as set forth in part II.B of the Argument section below), those CBAs referenced in the PLA that establish exclusive hiring halls and/or their accompanying hiring hall rules state that they are "non-discriminatory" and that they will not discriminate in referrals based on membership or non-membership in the union. *See, e.g. McConnell Aff., Ex.13, Art.6 & Referral Rule 8.2; Ex.14, Sec. 4.04; Ex.15, Art.IV(d); Ex.16, Art.XXII, Para. 1(a); Ex.17, Art.6.B; Ex.18, Art.6; Ex.19, Art.5, Sec. 4(f)(13); Ex.20, Art.IV, Sec.3; Ex.21, Art.IV, Sec. 3; Ex.22, Art.III, Sec.9 and Dispatch Procedure Sec.1.*

IV.    **The PLA's Fringe Benefits Provision Plainly States That It Only Requires Contributions For Bona Fide Employee Benefits That Accrue Directly To The Employee**

Article V, Section 2 of the Minneapolis Schools PLA provides for employers to contribute to certain employee benefit funds established in the CBAs. *PLA, Art.V, Sec.2.* The PLA makes clear in its plain language that employers are required to contribute to funds only for "***such bona fide employee benefits as accrue to the direct benefit of the employee*** (such as pension and annuity, health and welfare, vacation, apprenticeship and training funds, etc.)." *Id.* Thus, employers must make contributions to pay for employee benefits that directly benefit the employee, not for politics or other purposes.

V.    **Plaintiff Laketown Admittedly Has Not Bid On Any Work Under The PLA, And Plaintiff ABC's Members Have Been Awarded Work Under The PLA**

Plaintiff Laketown Electric Corporation ("Laketown" or "Employer") admittedly is "willing and able" but has failed to bid on work under the PLA. *Compl. ¶11.* Plaintiff Associated Builders and Contractors, Inc., Minnesota/North Dakota Chapter ("ABC" or "Employer Association") is an anti-union association of construction industry employers. *Compl., ¶¶3,7-9.* The ABC alleges that they have "actively opposed project labor agreements for years" based on their mission "to promote and defend the merit shop philosophy." *Id. ¶¶3,9.* The ABC alleges that several of its members "are willing and able to submit bids" for work covered by the PLA. *Id. ¶8.* In fact, non-union contractors that are members of the ABC have been awarded work under the PLA. *McConnell Aff., ¶5, Exs.24-25.*

## ARGUMENT

### I.    LEGAL STANDARD

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "At a minimum . . . a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." *Hanten*, 183 F.3d at 805. The Court "is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences, and sweeping legal conclusions cast in the form of factual allegations." *Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir. 2017).

When deciding a Rule 12(b)(6) motion to dismiss, the Court may rely on documents other than the pleadings without converting the motion to one for summary judgment where, as here, those documents are incorporated by reference or "embraced by the pleadings." *See, e.g., Roe v. Nebraska*, 861 F.3d 785, 788, *rhrg. and rhrg. en banc denied* (8th Cir. 2017). The Court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record" without converting a Rule 12 motion to a summary judgment motion. *Miller v. Redwood Toxicology Lab., Inc.,* 688 F.3d 928, 931 n.3 (8th Cir. 2012). In this case, the Complaint embraces, and incorporates by reference, the PLA attached in Exhibit A to the Complaint as well as the CBA hiring provisions that are referenced and incorporated in Article III, Section 2 and Schedule A of the PLA (*McConnell Aff., Exs.1-22*).

On a Rule 12(b)(1) motion, such as a motion asserting lack of standing, "a district court may look outside the pleadings to affidavits or other documents." *Moss v. United States*, 895 F.3d 1091, 1097 (8ᵗʰ Cir. 2018); *see also Faibisch v. University of Minnesota*, 304 F.3d 797, 801 (8ᵗʰ Cir. 2002) (standing argument implicates Rule 12(b)(1)). "This does not ... convert the 12(b)(1) motion to one for summary judgment." *Moss*, 895 F.3d at 1097. Thus, for purposes of the standing question the Court can consider Letters of Assent demonstrating that non-union contractors have regularly bid on and been awarded work under the PLA, including ABC members. (*McConnell Aff., ¶5, Exs.24,25*).

## II.    BINDING SUPREME COURT AND EIGHTH CIRCUIT PRECEDENT FORECLOSES PLAINTIFF'S FIRST AMENDMENT CLAIMS CHALLENGING THE PLA'S HIRING PROCEDURES

Plaintiffs' First and Second Claims allege that the PLA supposedly violates the freedom of speech and association of non-union contractors and their employees by requiring that they utilize the hiring procedures contained in the CBAs. These claims are precluded by binding authority of the United States Supreme Court and the Eighth Circuit.

### A.    Supreme Court Authority Bars Plaintiffs' Freedom of Association Claim Because Hiring Construction Workers Is Not An "Expressive Association"

Plaintiffs wrongly assume that any "association" between two groups rises to the level of an expressive association warranting First Amendment protection. On the contrary, the Supreme Court's compelled association cases make clear that a First Amendment claim can only be brought if the plaintiff is engaged in an association for purposes of expressive activity—which hiring employees to work on construction

9

projects plainly is not.   For example, in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Court held that an organization that engaged in expressive activity could not be required to accept an unwanted member when doing so would force the organization to send a message it did not want to send.  *Id.* at 659.  This case is nothing like *Dale* because hiring employees for construction work is not an expressive activity that sends a message of any kind.

Rather, as in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47 (2006), the "association" alleged here is much more limited.  In that case, law schools were required to "'associate' with military recruiters in the sense that they interact with them," but there was no compelled *expressive* association because the recruiters came onto campus for a "limited purpose," and "not to become members of the school's expressive association."  *Id.* at 69.   In this case, if Laketown actually had bid on and accepted work for the School District, its association with the union through the PLA's hiring procedures would be similarly limited because:  (1) hiring construction workers is not an expressive activity in any reasonable understanding, (2) the PLA's hiring procedures do not require the Employer to become signatory with the Union, and (3) the employees hired through the PLA's hiring procedures do not have to join the Union.  *See supra, Complaint Allegations Section, parts II and III.*

Even if hiring construction workers were an expressive activity, it would not be reasonable to conclude that every employer necessarily agrees with the Unions simply by obtaining referrals of employees under the PLA, especially those employers that have been outspoken about their opposition to unions through their membership in the ABC.

*See, e.g., FAIR*, 547 U.S. at 65 (rejecting First Amendment claim because "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies."); *Cf. Board of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250 (1990) (even high school students understand that school does not endorse speech of school-recognized student groups). As a result, there clearly is no compelled expressive association between Plaintiffs and the Unions that are signatory to the PLA, and Plaintiffs' freedom of association claim must be dismissed.

> **B.    Eighth Circuit Authority Precludes Plaintiffs' Claim Because Any Incidental Impact On Plaintiffs' Freedom Of Association Due To The PLA's Hiring Procedures Would Be Supported By A Rational Basis**

Even if there were an incidental impact on Plaintiffs' First Amendment rights, which there clearly is not in this case, such an impact would be justified under *Hanten*. In *Hanten* the Eighth Circuit rejected First Amendment claims by a non-union subcontractor, three of its employees, and a taxpayer alleging that a school district prevented the subcontractor and its employees from working on a school construction project based on "a governmental preference for union labor" stated in the bid specifications. 183 F.3d at 800, 806-07. Notably, in *Hanten* the subcontractor's employees sued on their own behalf. Here, the Employer and the Association improperly seek to assert employees' rights vicariously, making the First Amendment claims even more tenuous.

The Eighth Circuit began its analysis in *Hanten* by observing that the right of free

association presupposes a freedom not to associate. *Id.* at 805.  The Court went on to explain that a government action that has only an incidental impact on the freedom of association is subject to rational basis review:

> [N]ot every governmental practice that might conceivably impose upon a citizen's freedom to associate is actionable. Indeed, . . . the school district was entitled to engage in conduct that incidentally inhibited protected forms of association like non-union membership so long as that conduct was rational and was related to a legitimate governmental purpose.

*Id.* at 805-06, *citing Lyng v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW,* 485 U.S. 360, 366 (1988).  The Court reviewed the complaint and concluded that it failed to allege any facts suggesting that the School District's preference for union labor had more than an "incidental" impact on the employees' right not to associate with a union.  183 F.3d at 806.

Similarly, in this case the Complaint contains no factual allegations that would support a conclusion that the PLA's hiring provisions would "directly or substantially interfere" with the rights of Laketown's employees, or any employees, not to join the Union. *Id.* at 806.  In fact, the federal case cited by Plaintiffs in their Complaint confirms that exclusive hiring halls are *not* discriminatory against non-members and do not coerce membership. *See NLRB v. Local 334, LIUNA*, 481 F.3d 875, 880 (6th Cir. 2007), *cited in Compl., ¶48*.  "Federal labor law requires union hiring halls to be nondiscriminatory, that is, to refer both union and non-union personnel for jobs without discriminating on the basis of union membership." *Queen City*, 604 N.W.2d at 371 (citing NLRA provisions); *see also Int'l All. Of Theatrical Stage Emps., Local Union No. 151 v. NLRB*, 885 F.3d 1123, 1132 (8th Cir. 2018) ("It is well settled that "a union cannot operate a hiring hall to

12

discriminate based on an employee's lack of union membership."); *Breininger v. Sheet Metal Workers Int'l Ass'n Local No.6*, 493 U.S. 67, 88 (1989). Further, employees who are represented by a union have a right under federal labor law not to join a union, and may only be required to pay to the union a fee for the cost of representational activities as a condition of employment. *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 37-38 (1998); *Communications Workers v. Beck*, 487 U.S. 735 (1988).

The allegation that "their employees miss out on profits" because Laketown or other ABC contractors decline to bid on School District work is both conclusory and implausible. *Compl., ¶84.* Apart from the common-sense point that construction employees generally receive wages rather than profits, Laketown admittedly has not bid on any work with the School District and yet is "[o]ne of the fastest growing companies in Minnesota," so it cannot plausibly contend that its employees somehow have felt any pressure to associate with the Union as a result of the PLA. *Compl., ¶¶3,11.* Thus, the conclusory allegations in the Complaint that the PLA supposedly interferes with workers' rights not to associate with a union should be rejected here as they were in *Hanten*.[2]

In *Hanten*, the Eighth Circuit found that the "governmental preference for union

---

[2] Plaintiffs make the irrelevant allegation that most of Minnesota's construction workforce is not unionized. *Compl., ¶30.* Plaintiffs overlook that the vast majority of workers on school construction projects in the seven-county Minneapolis/St. Paul metropolitan area are represented by unions due to the high union density in the area, which is second only to Chicago according to the *Current Population Survey Outgoing Rotation Groups. See* Frank Manzo and Kevin Duncan, "An Examination of Minnesota's Prevailing Wage Law," p. 49 (May 2018), http://fcfmn.org/wpcontent/uploads/2018/07/An-Examination-of-Minnesotas-Prevailing-Wage-Law-FINAL.pdf. Although the question of union density is not relevant to Plaintiffs' claims, the Court may take judicial notice of this study if it is inclined to evaluate whether Plaintiffs' allegation on this point is plausible.

labor" was supported by a rational basis:

> We believe that when the government, acting like a private business, states a preference for union labor in construction bid specifications, such a preference is facially rational. The preference for union labor at a construction project is based upon the desire to avoid expensive and time consuming workplace disruptions, and that purpose is clearly legitimate as well as rational. . . . [I]t is legitimate and rational because it seeks workplace harmony at a construction site where cooperation can be especially critical to the prompt and economical completion of public works.

183 F.3d at 806-07 (citing Supreme Court and Eighth Circuit authority). The language of

the PLA in this case embraces the same purposes recognized as "legitimate and rational"

by the Eighth Circuit in *Hanten* and in the Supreme Court case law cited therein:

> Construction of the Project will entail utilization of the construction industry in an area having multiple labor contracts and employer associations. Consequently, conflicts within labor-management relations could cause delay or disruption of the efficient completion of the Project unless maximum cooperation of all segments of the construction industry is obtained. It is in the public interest that the Project progress be completed in an expeditious and efficient manner, free of the disruption or delay of any kind. Therefore, it is essential to secure optimum productivity and to eliminate any delays in the work.

*PLA, Art.I.* Thus, even if the PLA's hiring procedures expressed a "preference for union

labor" as Plaintiffs allege, those hiring procedures would have a rational basis under

*Hanten*.

In addition, the PLA makes clear that its hiring procedures are intended to supply

"substantial numbers of employees from construction and supporting crafts, possessing

skills and qualifications that are vital to [the Project's] completion." *PLA, Art.I.* The

courts have recognized that this is a legitimate governmental interest for requiring a PLA.

*See Queen City*, 604 N.W.2d at 378 ("Rochester can impose a PLA bid specification in

order to ensure the availability of skilled labor"). Hence, the PLA's hiring hall

14

procedures are rationally related to the legitimate governmental purpose of providing for a substantial supply of skilled labor for the School District's projects.

To the extent that Plaintiffs argue that the PLA's hiring procedures violate the free association rights of Laketown or other *employers*, those claims also fail under *Hanten*. Plaintiffs do not allege any facts to support a conclusion that those hiring procedures require or coerce any employer to become a union signatory contractor. Indeed, the PLA's plain language makes clear that contractors need not become union signatories in order to work under the PLA. *PLA, Art.II, Secs.1,4.* The Eighth Circuit recently followed *Hanten* in rejecting a First Amendment challenge by a contractor to a government decision not to select the low bidder allegedly because the contractor was not signatory with an AFL-CIO Union. *See Higgins Electric, Inc. v. O'Fallon Fire Protec. Dist.*, 813 F.3d 1124, 1130 (8th Cir. 2016). By analogy, in this case Plaintiffs have not provided any plausible account of how their freedom of association has been restricted by the requirement of signing the PLA or using its hiring procedures.

Plaintiffs simply object to the PLA's hiring procedures based on their "merit shop philosophy." *Compl., ¶¶3,9.* This is not sufficient to state a First Amendment claim, as the Supreme Courts of Iowa and California have explained:

> **[W]e do not believe that the PLA prevents the appellants "from freely expressing their 'merit shop philosophy' and opposition to unions, nor does it coerce 'pro-union' expressions or association."** Contractor members of the appellant organizations may feel disinclined to bid or do work under the provisions of the PLA, but "the First Amendment does not oblige the government to minimize the financial repercussions of such a choice." The adoption of the PLA does not impinge on the appellants' free association rights.

15

*Master Builders of Iowa, Inc. v. Polk County*, 653 N.W.2d 382, 399 (Ia. 2002) (emphasis added, internal citations omitted), *quoting Lyng*, 485 U.S. at 368; *accord Associated Builders and Contractors, Inc. v. San Francisco Airports Com*., 21 Cal.4th 352, 380 (Cal. 1999) ("Nothing in the [PLA] stops ABC or its members from, or punishes them for, engaging in whatever political action or advocacy they wish.").

It cannot credibly be argued here that use of the PLA's hiring procedures imposes even an incidental impact on the freedom of association of Laketown or other employers. As the Supreme Court noted in *Boston Harbor*, "[t]hey may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement."  507 U.S. at 231.

Even if there were an incidental impact, it would be supported by a rational basis for the reasons stated in *Hanten*, 183 F.3d at 806-07.  Plaintiffs' argument that "[a]ny interest in preventing work stoppages and ensuring the timely completion of projects could be satisfied with contractual provisions between a contractor and the Minneapolis Public School District" overlooks that the Union, as employee representative, must be a party to the applicable contract in order to assure no work stoppages by employees. *Compl., ¶77.*  An employer cannot vicariously waive its employees' rights to engage in concerted activity under the NLRA.  *See* 29 U.S.C. §157.

16

**C.    Supreme Court And Eighth Circuit Authority Forecloses Plaintiffs' Free Speech Claim Because the PLA Does Not Discriminate Against Their Non-Union "Viewpoint," And The PLA Would Not Require Plaintiffs To Host Or Accommodate A Pro-Union Message**

Plaintiffs argue that the PLA somehow constitutes "viewpoint discrimination." *Compl., ¶72.* It cannot plausibly be alleged that the PLA discriminates against a non-union "viewpoint" when non-union contractors are expressly allowed to work under the PLA and when applicable law provides that their employees do not have to be union members or join the union. *See supra, Complaint Allegations Section, parts II and III.*

In any event, in *Hanten* the Eighth Circuit rejected the argument that an express "governmental preference for union labor" on a school district construction project constituted viewpoint discrimination or retaliation:

> Liberally construing the complaint in favor of the plaintiffs, no inference can fairly be drawn that any of the plaintiffs were targeted by the defendants for their non-union associations or views. As a matter of fact, the undisputed evidence establishes that plaintiffs could not fairly make such an allegation.

183 F.3d at 807-08. Accordingly, *Hanten* bars Plaintiffs' claim that a purported preference for union labor allegedly constitutes viewpoint discrimination or retaliation for political speech.

Moreover, Plaintiffs have no free speech claim under Supreme Court case law because they cannot plausibly allege that they are forced to host or endorse the Union's message as a result of hiring construction workers. *Cf. Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995) (State cannot require parade to include group whose message parade organizer does not want to send).

17

A reasonable outsider would not believe that Plaintiffs—an anti-union Employer

Association and Employer—agree with any message of the Unions simply because they

utilize the PLA's hiring procedures.  *See FAIR*, 547 U.S. at 65 ("Nothing about recruiting

suggests that law schools agree with any speech by recruiters …."); *PruneYard Shopping*

*Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (rejecting shopping center owner's claim that law

requiring him to allow expressive activity on his property compelled his speech because

"[t]he views expressed by members of the public in passing out pamphlets … will not

likely be identified with those of the owner").  Because the Unions' speech cannot

reasonably be attributed to Plaintiffs for First Amendment purposes, Plaintiffs' free

speech claim lacks merit and must be dismissed.

The cases cited by Plaintiffs in their Complaint are inapplicable.  Plaintiffs cite

*O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996) for the

proposition that public employment cannot be conditioned on the exercise of First

Amendment rights.  However, the PLA applies to private employees, not public

employees, and in any event, no employee or applicant is coerced or required to be a

union member to be referred through the Unions' hiring procedures or to work under the

PLA.  *See supra, Complaint Allegations Section, part III.*

In *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 134 (2d. Cir.

2013), the court did not articulate the broad proposition that "opposition to labor unions

is inherently political" as Plaintiffs erroneously allege.  *Compl. ¶75.*  Indeed, the Supreme

Court has emphasized that opposition to private sector unions and their wages and

18

benefits is generally not "political" in nature.  *See Janus v. AFSCME Council 31*, 138 S.Ct. 2448, 2480 (2018).

### D.    Plaintiffs' Efforts to Distinguish *Hanten* Are Unavailing

Plaintiffs attempt to distinguish *Hanten* on the basis that it "did not directly address the constitutionality of union hiring halls."  *Compl., ¶86*.  This purported distinction provides no support for Plaintiffs' claims.  If the school district's express requirement to engage only union signatory subcontractors based on a preference for union labor was permissible in *Hanten*, 183 F.3d at 800, the PLA's use of less restrictive non-discriminatory hiring procedures to achieve similar objectives of workplace harmony and timely project completion are even more clearly permissible here.

Plaintiffs also attempt to distinguish *Hanten* on the basis that the court "may have reached a different result if it were examining a more detailed complaint."  *Compl., ¶86*.  This is mere speculation at best.  In any event, Plaintiffs' Complaint in this case suffers from the same deficiencies of conclusory allegations that the court identified in *Hanten,* as explained above.  Lastly, Plaintiffs try to distinguish *Hanten* on the basis that is "relied on the Supreme Court's subsidy case" and this is supposedly not a subsidy case. *Compl., ¶86*.  But like this case *Hanten* involved a school district's labor requirements for its construction contractors.  Thus, this distinction is inapposite.

### E.    *Janus* Applies To Public Sector Agency Fees, Not Private Sector Hiring Procedures

To the extent Plaintiffs rely on the Supreme Court's decision in *Janus*, 138 S.Ct. at 2448, that reliance is misplaced.  *Janus* addressed the constitutionality of statutory

requirements that public employees pay money to unions to cover the cost of

representation in bargaining with a public employer. In contrast, the PLA's hiring

procedures apply to private sector employees, not public employees. In *Janus*, the Court

distinguished public employees from private sector employees as follows:

> Assuming for the sake of argument that the First Amendment applies at all to
> private-sector agency-shop arrangements, the individual interests at stake still
> differ. In the public sector, core issues such as wages, pensions, and benefits are
> important political issues, but that is generally not so in the private sector.

*Janus*, 138 S.Ct. at 2480 (citations omitted). In addition, unlike the agency fee provisions

in *Janus*, the PLA's hiring hall procedures do not require employees to pay any money to

a union that could arguably subsidize political speech. The hiring hall procedures simply

provide for referrals from union hiring halls for those unions that have negotiated referral

procedures. Thus, *Janus* has no bearing on this case.

### III.    CLEARLY ESTABLISHED PRECEDENT OF THE EIGHTH CIRCUIT AND OTHER COURTS BARS PLAINTIFFS' EQUAL PROTECTION CLAIM BECAUSE THE PLA DOES NOT DISCRIMINATE AGAINST PLAINTIFFS AND, IN ANY EVENT, IT IS SUPPORTED BY A RATIONAL BASIS

Plaintiffs allege an equal protection violation on the theory that "[f]avoring union

contractors over merit-shop contractors is not rationally related to a legitimate

governmental interest" and "[f]avoring employees from union hiring halls over other

employees is not rationally related to a legitimate governmental interest." *Compl., ¶¶90,

91*. In *Hanten*, the Eighth Circuit held the opposite, stating that a preference for union

labor "is legitimate and rational because it seeks workplace harmony at a construction

site where cooperation can be especially critical to the prompt and economical completion of public works."  183 F.3d at 807.

More importantly, the PLA does not, in fact, draw a distinction between union and non-union contractors or union and non-union employees.  *See San Francisco Airports Com.*, 21 Cal.4th at 381-82 (dismissing equal protection claim because "the [PLA] excludes no contractor or employee; any contractor, whether union or nonunion, is free to bid on the project."); *Associated Bldrs. & Contrs. v. Jefferson Cty. Bd. Of Commrs.*, 665 N.E.2d 723, 726 (Ohio Ct. App. 1995) (dismissing equal protection claim because "under the PLA, no individual or contractor is precluded from working on the project based upon their affiliation or nonaffiliation with a labor union.").

Instead the only relevant distinction is between those contractors who are willing to abide by the PLA and those who are not, in order to advance the School District's interest in timely and effective construction of its projects.  *PLA, Art.II, Secs.1,4*; *Queen City*, 604 N.W.2d at 371.  A requirement of abiding by a PLA to ensure workplace harmony, a reliable supply of skilled labor, and efficient project completion is rationally related to a legitimate governmental interest, as recognized by the Supreme Court and other courts throughout the country, including here in the District of Minnesota.  *See Boston Harbor*, 507 U.S. at 232 (finding that public agency properly adopted PLA "attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost"); *Johnson v. Rancho Santiago Community College Dist.*, 623 F.3d 1011, 1031 (9th Cir. 2010) (rejecting equal protection claim because "even if the [PLA] did cost the District more than it was worth, the District could

have rationally believed that the [PLA] would promote its legitimate interest in avoiding labor disruptions."); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. County of St. Louis*, 825 F.Supp. 238, 244 (D. Minn. 1993) (finding lack of likelihood of success on the merits of equal protection claim challenging a PLA because "The county had a legitimate interest in protecting against labor disruptions on the construction of the jail."); *Master Builders of Iowa*, 653 N.W.2d at 398 (rejecting equal protection claim because PLA satisfied rational basis scrutiny); *Laborers Local No. 942 v. Lampkin*, 956 P.2d 422, 431-32 (Ak. 1998) (rejecting equal protection claim "[g]iven the relationship between the terms of the PLA and the special requirements of the Lathrop High Project, the established use of project labor agreements in the construction industry, and the express endorsement of these agreements by Congress and the Supreme Court."). Accordingly, Plaintiffs' equal protection claim must be dismissed.

## IV.    CLEARLY ESTABLISHED EIGHTH CIRCUIT AUTHORITY PRECLUDES PLAINTIFFS' DUE PROCESS CLAIM BECAUSE PLAINTIFFS HAVE NO PROPERTY OR LIBERTY INTEREST AT STAKE

Under *Hanten* and *Higgins*, and the plain language of the Fourteenth Amendment, Plaintiffs must first establish that they have a "property interest at stake" in order to assert a due process claim. 183 F.3d at 808-09; *Higgins*, 813 F.3d at 1130. In *Hanten* the Court found that an unsuccessful bidder on a construction project had no property right in the contract. 183 F.3d at 808-09. State law determines the sufficiency of the claim of a property interest. *Id.* at 808. In *Higgins*, the Eighth Circuit reached the same conclusion in dismissing the due process claim. 813 F.3d at 1130.

22

Minnesota courts have ruled that a contractor has no property interest in a construction contract "when the bidder failed to establish that it was the lowest bidder conforming to contract specifications." *In re Administrative Reconsideration Hearing Request ex rel. Cent. Specialties, Inc.*, No. A12–0024, 2012 WL 3641295, *7 (Minn. Ct. App. 2012); *citing Schwandt Sanitation v. City of Paynesville,* 423 N.W.2d 59, 66 (Minn. Ct. App. 1988). In this case Plaintiffs have admittedly not submitted a bid on any School District Project, much less the lowest bid conforming to the specifications. *Compl., ¶¶8,11.* Accordingly, Plaintiffs' Complaint fails to allege a property interest at stake, and their due process claim must be dismissed under *Hanten* and *Higgins*. *Accord Johnson*, 623 F.3d at 1030 ("the [PLA] did not deprive the plaintiffs of any liberty or property interest protected by the Due Process Clause."); *Utility Contractors Ass'n of New England, Inc. v. Comr's of Massachusetts Dept. of Public Works*, No. CIV.A.90–3035, 1996 WL 106983, *15-16 (Mass. Super. Ct. 1996) (same); *Colfax Corp. v. Illinois State Toll Highway Authority*, No. 93-C-7463, 1994 WL 444882, *8 (N.D. Ill. 1994) (same); *County of St. Louis*, 825 F.Supp. at 244.

Plaintiffs' reliance on *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972) is fruitless. In that case the Supreme Court held that the plaintiff, an untenured faculty member who was not rehired for a subsequent year, had no liberty or property interest at stake because he remained free to take advantage of other employment opportunities. Similarly, in this case, Laketown Electric and other construction contractors who allegedly choose not to bid for work on School District projects because of the PLA remain free to pursue other opportunities, as do their employees. As the Supreme Court

23

noted in *Boston Harbor*, "[t]hey may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement." 507 U.S. at 231. Accordingly, they have no property or liberty interest at stake, and Plaintiffs' due process claim must be dismissed.

### V. PLAINTIFFS' FIRST AMENDMENT CLAIM CHALLENGING THE PLA'S FRINGE BENEFITS PROVISION IS BASELESS BECAUSE THE PLA CLEARLY STATES THAT EMPLOYERS ARE ONLY REQUIRED TO PAY FOR BONA FIDE BENEFITS THAT ACCRUE DIRECTLY TO THE EMPLOYEE

Plaintiffs' First Amendment claim challenging the PLA's fringe benefits provision is premised on a *non sequitur*. Plaintiffs allege that by contributing to trust funds to pay for employee benefits, employers would somehow free up more union money for "other activities" including "lobbying." *Compl., ¶99.* This allegation is illogical and thus implausible. It makes no sense that employer contributions to the employee benefit trust funds, which Plaintiffs acknowledge and the PLA states are separate entities *funded by employers not unions*, would somehow free up more union money for politics. *Compl., ¶¶53,98*; *PLA, Art.V, Sec.2.*

To the extent that Plaintiffs are suggesting that the fringe benefit funds themselves may spend money directly on "political advocacy" for union interests, *Compl., ¶100,* that assertion contradicts the PLA's plain language. The PLA makes clear that employers are required to contribute to the jointly administered funds only for "***such bona fide employee benefits as accrue to the direct benefit of the employee (such as pension and annuity, health and welfare, vacation, apprenticeship and training funds, etc.)***." *PLA, Art.V, Sec.2. (emphasis added).* Thus, the plain terms of the PLA prohibit contributions

to funds that would go to politics and instead require that they "accrue to the direct benefit of the employee."  Accordingly, Plaintiffs' vague and conclusory insinuation that fringe benefit fund contributions under the PLA might be used for politics is entirely implausible.

Moreover, the governing law prohibits the fringe benefit funds referenced in the PLA from spending money on politics or "union speech."  *See, e.g., NLRB v. Amax Coal*, 453 U.S. 322, 329-34 (1981).  The trustees of a jointly administered employee benefit fund have a fiduciary duty to spend the fund's money exclusively for the benefit of the plan's beneficiaries, not for political advocacy directed by an appointing party.  *Id*. at 329-34.  The obligation of trustees of the benefit funds to serve the interests of the benefit fund and its beneficiaries – and not those who appointed them – was codified in ERISA. See *Amax Coal*, 453 U.S. at 332.  Indeed, the requirements of ERISA "specifically insulate the trust" from the interests of the union or the employer.  *Id*. at 333.  The fiduciary obligations of ERISA "were designed to prevent a trustee 'from being put into a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'"  *Id*. at 334.  Thus, under applicable law, the trustees who act as plan fiduciaries of the benefit funds are required to spend the money solely for the benefit of the plan's beneficiaries, not for political advocacy for unions.

In addition, even if the fringe benefit funds did not "accrue to the direct benefit of the employee," but instead could be used for lobbying or politics—which is clearly not the case under the PLA—there would still be no violation of the First Amendment.  A

reasonable outsider would not conclude that contributing employers necessarily agree with any purported lobbying or other alleged political activity of a benefit fund to which they contribute. *See FAIR*, 547 U.S. at 65; *PruneYard*, 447 U.S. at 87. Thus, Plaintiffs have no First Amendment claim under Supreme Court case law.

## VI.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS BECAUSE THEY HAVE SUFFERED NO INJURY-IN-FACT

Constitutional standing is a jurisdictional necessity. *Spokeo v. Robins*, 136 S.Ct. 1540, 1547 (2016). On a Rule 12(b)(1) motion, the party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence. *Moss*, 895 F.3d at 1097. To demonstrate Article III standing, a plaintiff must establish: (1) injury-in-fact; (2) a causal connection between the injury and the conduct at issue; and (3) a likelihood, as opposed to mere speculation, that the remedy the plaintiff seeks will redress the alleged injury. *Spokeo*, 136 S.Ct. at 1547. The Supreme Court has reaffirmed that, to have a sufficient "injury-in-fact," a plaintiff's injury must be both "particularized" and "concrete," as well as "actual or imminent, not conjectural or hypothetical." *Id.* at 1548. Moreover, the concrete injury "must be 'de facto,' that is, it must actually exist." *Id.*

### A.   Laketown Lacks Standing Because It Has Suffered No Injury-In-Fact

Laketown has not pled any facts that would establish that it has suffered an injury of any kind, much less an injury that is both particularized and concrete as required by Article III. Laketown admits that it is "willing and able" to bid on ongoing or anticipated projects covered by the PLA, yet admittedly has failed to submit a bid. *Compl., ¶11*. On the face of the PLA and under applicable law, non-union contractors are eligible to bid

and be awarded work under the PLA.  *See Supra, Compl. Allegations Section, Part II*;

*Queen City*, 604 N.W.2d at 371, 376.  In fact, non-union contractors have regularly bid

on and been awarded work under the PLA.  *McConnell Aff., ¶5, Ex.24*.  Laketown cannot

plausibly contend that it would have been excluded from work under the PLA, or that

working under the PLA would have somehow violated its rights, without even attempting

to bid under the PLA as other non-union contractors have done successfully.  Thus,

Laketown's purported injury is hypothetical at best, and not concrete or particularized.

Accordingly, Laketown lacks standing to bring its claims.  *See Connecticut ABC v. City

of Hartford*, 740 A.2d 813 (Conn. 1999) (holding that "nonbidding contractors and

subcontractors" and the ABC lacked standing to challenge a PLA).

    **B.**    <u>The ABC Lacks Organizational Standing Because It Has Not
Suffered Any Injury-In-Fact</u>

An organization may have standing to sue on its own behalf, but the organization

must meet the Article III standing requirements.  *Havens Realty Corp. v. Coleman*, 455

U.S. 363, 378 (1982).  The organization must demonstrate that it has suffered an injury-

in-fact, including such "concrete and demonstrable injury to [the] organization's

activities which drains its resources and is more than simply a setback to its abstract

social interests." *Nat'l Fed'n of Blind of Missouri v. Cross*, 184 F.3d 973, 979-80 (8th

Cir. 1999), *citing Havens*, 455 U.S. at 379; *see also Sierra Club v. Morton*, 405 U.S. 727,

739 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest

and no matter how qualified the organization is in evaluating the problem, is not

sufficient by itself to render the organization 'adversely affected[.]'"); *Arkansas ACORN*

*Fair Hous., Inc. v. Greystone Dev. Co.*, 160 F.3d 433, 434 (8th Cir. 1998) (finding no standing where plaintiff presented "no facts to quantify the resources, if any, that were expended" or how those expenditures were traceable to defendant's conduct).

The ABC's alleged injuries are hypothetical at best and therefore insufficient to establish organizational standing. *See Connecticut ABC*, 740 A.2d 813 (finding that ABC lacked standing to challenge a PLA). Non-union contractors have regularly bid on and been awarded work under the PLA, including ABC members. *McConnell Aff., ¶5, Exs.24,25.* The allegation that the PLA is contrary to the ABC's general interest in promoting and defending the "merit shop philosophy" does not constitute a concrete and particularized injury. *Compl., ¶3.* The allegation that the ABC "has actively opposed project labor agreements for years" is the type of abstract concern that does not confer standing. *See, e.g.*, *Simon v. Eastern Ky. Welfare Rights Org.*, 462 U.S. 26, 39-40 (1976) (An organization interested in issues relating to access to medical care "could not establish … standing simply on the basis of that goal.").

Moreover, the ABC has not pled any facts either to quantify or specify the resources, if any, that it has supposedly spent on "counteracting the project labor agreement provisions challenged herein." *Compl., ¶9*; *Arkansas ACORN*, 160 F.3d at 434. That allegation is abstract and conclusory—failing to specify what it means to "counteract" the PLA. The impact that the provisions of the PLA supposedly have had or might have on the ABC is entirely abstract, vague, and speculative and therefore cannot rise to the level of the "concrete" and "particularized" injury required for Article III standing.

28

### C.    The ABC Lacks Standing To Sue On Behalf Of Its Members

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Here, the ABC has failed to allege any specific facts that would establish that its members, including Laketown, would have standing to sue in their own right. Instead, the ABC alleges that it "has several members who are willing and able to submit bids and work on projects covered by project labor agreements to which the District is a party." *Compl., ¶8.* Thus, those members, like Laketown, have failed to submit bids despite being "willing and able," so their claims of purported exclusion from working under the PLA or harm from working under the PLA are merely hypothetical. In fact, some ABC members have successfully bid on and have been awarded work under the PLA, contradicting the vague implication that the PLA somehow excludes the ABC's members or deters them from bidding. *McConnell Aff., ¶5, Exs.24-25.* Accordingly, the ABC cannot show that it has standing to sue on behalf of its members.

### D.    Plaintiffs Lack Standing To Assert Claims On Behalf Of Third-Party Employees

Plaintiffs, an Employer and Employer Association, lack standing to assert the purported First Amendment claims of employees. The general rule regarding third-party

standing is that: "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991), *citing Department of Labor v. Triplett*, 494 U.S. 715, 720 (1990).

A litigant can only bring an action on behalf of third parties when three criteria are satisfied: (1) the litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; (2) the litigant must have a close relation to the third party; and (3) there must exist some hindrance to the third party's ability to protect his or her own interests. *Powers*, 499 U.S. at 410-11. Neither Laketown nor the ABC has suffered an injury-in-fact. Moreover, even assuming *arguendo* that the employees purportedly have a "close relationship" with the Employer or the Association, which is not clear from the Complaint, there is no allegation of a hindrance to employees' ability to protect their own interests. Accordingly, the Employer and Employer Association lack standing to sue on behalf of employees.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety and with prejudice and award such other relief as may be just and equitable.

30