# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, INC. MINNESOTA/NORTH DAKOTA CHAPTER; AND LAKETOWN ELECTRIC CORPORATION.<br><br>            Plaintiffs,<br><br>        v.<br><br>MINNEAPOLIS PUBLIC SCHOOLS, SPECIAL SCHOOL DISTRICT NO.1; and NELSON INZ, in his official capacity as Chairperson of the Minneapolis Board of Education,<br>            Defendants,<br>and<br><br>MINNEAPOLIS BUILDING AND CONSTRUCTION TRADES COUNCIL,<br>            Defendant-<br>            Intervenor. | Case No. 0:19-cv-00656-DWF-BRT<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS** |

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................- 1 -

STATEMENT OF FACTS ...................................................................................- 3 -

    A.  Project Labor Agreements ...................................................................- 3 -

    B.  Minneapolis Public Schools' Adoption of PLAs...............................- 5 -

    C.  Minnesota ABC and Laketown Electric ...........................................- 6 -

    D.  Union Hiring Provision.....................................................................- 7 -

    E.  Fringe Benefits Provision ................................................................- 9 -

    F.  Procedural History .........................................................................- 10 -

STANDARD OF REVIEW ..............................................................................- 10 -

i

ARGUMENT ....................................................................................................- 12 -

I.    Plaintiffs Have Standing To Press Their Federal Civil Rights Claims ........- 12 -

   A.   Laketown Has Standing To Press Its Federal Civil Rights Claims ........- 12 -

   B.   The Association Has Standing To Press Its Federal Civil Rights Claims ..............- 16 -

      i.   The Association Has Standing To Sue as the Representative
           of Its Members ...................................................................................- 16 -

      ii.  The Association Has Standing To Sue in Its Own Right....................- 17 -

   C.   Plaintiffs Have Third-Party Standing To Sue on Behalf of Their Employees .......- 19 -

II.   Plaintiffs State A Claim That the Union Hiring Provision Is Unconstitutional .........- 20 -

   A.   Plaintiffs State A Claim That the Union Hiring Provision Violates the
        Free Speech Clause of the First Amendment .........................................- 20 -

   B.   Plaintiffs State A Claim That The Union Hiring Provision Violates the Free
        Association Clause of the First Amendment ..........................................- 27 -

      i.   The Union Hiring Provision Interferes with the Internal Organization
           or Affairs of Minnesota ABC and Laketown .....................................- 28 -

      ii.  The Union Hiring Provision Imposes Penalties and Withholds Benefits
           Based on Membership in a Disfavored Group ....................................- 31 -

   C.   Plaintiffs State A Claim That the Union Hiring Provision Violates the Equal
        Protection Clause of the Fourteenth Amendment ....................................- 33 -

   D.   Plaintiffs State A Claim That the Union Hiring Provision Violates the
        Due Process Clause of the Fourteenth Amendment ...............................- 36 -

III.  Plaintiffs State A Claim That the Fringe Benefits Provision Violates
      the First Amendment................................................................................- 38 -

CONCLUSION ................................................................................................- 41 -

CERTIFICATE OF COMPLIANCE ..............................................................- 42 -

CERTIFICATE OF SERVICE ........................................................................- 43 -

## INTRODUCTION AND SUMMARY OF ARGUMENT

Laketown Electric Company is a family-owned business that has served Minnesota since 1975. Since that time, Laketown has maintained a reputation for excellence, and is rewarded multi-million dollar projects to build in school districts like North St. Paul. Yet Laketown cannot serve schools just down the road in Minneapolis, because projects there are governed by a project labor agreement between the Minneapolis Public Schools, Special School District No. 1 (School District)[1] and Minneapolis Building and Construction Trades Council (Union). The agreement requires contractors like Laketown to agree to forsake their employees in favor of workers recommended by the Union. And it requires contractors like Laketown to pay fringe benefits that do not best serve the interests of their employees.

The Associated Builders and Contractors, Minnesota/North Dakota (Minnesota ABC) advocates across the State for the rights of Laketown and other merit-shop contractors, who believe in free enterprise and open competition in the construction industry. Minnesota ABC has consistently advocated against the use of project labor agreements, which stifle competition, and increase costs.

Minneapolis Public Schools spends tens of millions of dollars in taxpayer money each year to build and service its schools. Yet since 2004, ongoing projects have incorporated the terms of a Union-negotiated PLA.

---

[1] Plaintiffs use "School District" to refer to both Minneapolis Public Schools and Nelson Inz, sued in his official capacity as Chairperson of the Minneapolis Board of Education.

- 1 -

This injures merit shop contractors like Laketown and other members of Minnesota ABC by forcing them to miss out on millions of dollars in profits if they do not agree to terms that they view as cost-prohibitive and unconstitutional. The School District requires contractors to eschew their regular employees in favor of workers presented by union hiring halls. If the School District forced contractors to obtain workers from the Democratic Party, there would be little doubt that the requirement would run headlong into the First Amendment's prohibition against viewpoint discrimination. Indeed, the requirement would be so arbitrary that it would violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Union Hiring Provision also violates the First Amendment right to associate. By requiring merit-shop contractors to accept workers from union hiring halls that the contractors have never supervised, the Provision constitutes a serious intrusion on the contractors' internal affairs.

Minneapolis Public Schools also violates the First Amendment by requiring contractors to agree to pay into fringe benefit funds. The government may not force contractors to contribute to causes they find objectionable. Minneapolis is an outlier in restricting competition in this way. Other school districts in Minnesota do not operate under project labor agreements, and each State that surrounds Minnesota has banned the use of PLAs in public projects. At a minimum, Plaintiffs should be afforded discovery to prove their claims.

## STATEMENT OF FACTS

### A.     Project Labor Agreements

A project labor agreement or PLA is a pre-hire collective bargaining agreement with a union that establishes employment terms and conditions for a specific construction project. *Building and Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002). PLAs typically require all contractors and subcontractors, whether unionized or not, to agree in advance to abide by the agreement for all work on the project. *Id.* Public entities generally implement PLAs by making agreement to their terms a bid specification, "thereby allowing the contracting authority to ensure that firms at every level—from the general contractor to the lowest level of subcontractor—comply with the terms of the PLA." *Id.* In other words, a contractor submitting the lowest bid cannot work on a project covered by a project labor agreement unless it agrees to all of the terms in the PLA. ECF No. 1, Compl. ¶ 20.

A PLA is considered a pre-hire agreement because it is negotiated before the contractor hires any workers to work on a project, and thus before the employees have consented to union representation *Id.* ¶¶ 17, 18. *See also Building and Constr. Trades Council of the Metropolitan District v. Assoc. Builders and Contractors of Mass./R.I., Inc. (Boston Harbor)*, 507 U.S. 218, 230 (1993) ("Prehire agreements are collective bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of hiring halls, prior to the hiring of any employees."). In most industries, pre-hire agreements violate the National Labor Relations Act. *See* 29 U.S.C. § 158(a), (b) (2000). PLAs, however, operate under the construction-industry exception to that rule. *Id.*

§ 158(f). This exception is based on multiple assumptions: (1) that the short-term nature of employment in the construction industry makes pre-hire collective bargaining difficult, and (2) pre-hire agreements in construction can meet a contractor's need for predictable costs and a steady supply of skilled labor. *See Boston Harbor*, 507 U.S. at 231.

Project labor agreements have existed in the United States since at least the 1930s, but were rarely imposed on government projects until the 1990s. *See* Maurice Baskin, *The Case Against Union-Only Labor Project Agreements*, 19 Constr. Lawyer 14 (Jan. 1999). Since that time, PLAs have been criticized on the grounds that they "promote special interest favoritism and undermine fundamental principles of open competition for government work." *Id.* As a result, PLAs are said to "reduce the number of bidders and increase the costs of construction, with no concomitant public benefits." *Id.*

Recognizing these concerns, federal and state governments have enacted regulations concerning the use of project labor agreements for public construction projects. In February 2001, President George W. Bush issued an executive order stating that the federal government will neither require nor prohibit the use of a PLA on any federal or federally funded construction project. *See Allbaugh*, 295 F.3d at 30 (citing 66 Fed. Reg. 11,225 (Feb. 22, 2001)). President Obama rescinded the order in February 2009. *See* Executive Order No. 13,502, 74 Fed. Reg. 6985 (Feb. 6, 2009) (allowing agencies to use PLAs for construction projects that cost the government over $25 million). At last count, 24 states have banned project labor agreements for public works project. Compl. ¶ 23.[2] In adopting

---

[2] In June, Texas became the 25th state to enact a ban of government-mandated PLAs. *See* Associated Builders and Contractors, *ABC Applauds Passage of Texas Law Ensuring Fair*

the bans, these states have echoed criticisms that have been leveled against PLAs for decades. *See, e.g.*, Mich. Comp. Laws § 408.872 (the ban's purpose is "to provide for more economical, nondiscriminatory, neutral and efficient procurement of construction-related goods and services" which will be achieved by "providing for fair and open competition").

**B.      Minneapolis Public Schools' Adoption of PLAs**

Minneapolis Public Schools, a school district that governs public schools in Minneapolis, spends over $66 million per year on contracted services. Compl. ¶¶ 12-13. These services include building new facilities in the school district, and maintaining the roughly 75 buildings that the School District currently owns. *Id.* ¶ 14.

In 2004, the School District entered into a comprehensive project labor agreement with the Minneapolis Building & Construction Trades Council, an umbrella organization for union construction crafts. *Id.* ¶ 43. The PLA specifies the terms of all subsequent construction and repairs in the Minneapolis Public School District. *Id.* As such, the terms of the project labor agreement are incorporated verbatim into ongoing construction projects in the school district. *Id.* ¶¶ 31-32.

As one example, the School District incorporated the terms of the PLA to its Project Manual for Electric Service, Maintenance, and Repair on February 25, 2019. *See id.* ¶ 24 & Exhibit A. The Project Manual requires each participating contractor to sign a letter of assent in which the contractor "agrees to accept and be bound by the terms and conditions

---

*and Open Competition* (Jun. 3, 2019), https://www.abc.org/News-Media/News-Releases/entryid/16524/abc-applauds-passage-of-texas-law-ensuring-fair-and-open-competition. As the infographic shows, every state that touches Minnesota has banned the use of government-mandated PLAs. *See id.*

of the Project Labor Agreement between Minneapolis Public Schools and the Minneapolis Building and Construction Trade Council" before it can submit a qualified bid. *Id.* Contractors who refuse to agree to these terms cannot work on that project or on any other project that has incorporated the terms of the PLA. *Id.* ¶ 29. A bid by a contractor who has not agreed to the terms of the PLA is not considered a qualified bid, and must be rejected by the School District, even if the contractor would have submitted the lowest bid. *See id.* ¶ 29.

### C. Minnesota ABC and Laketown Electric

The Associated Builders and Contractors, Minnesota/North Dakota Chapter (Minnesota ABC) is a professional trade organization that represents the interests of 350 construction-related firms and their employees throughout Minnesota, including Minneapolis. *Id.* ¶ 7. The contractors include Minnesota ABC members willing and able to submit bids on projects under the challenged PLA, and would do so if not for the requirement that they agree to the PLA's terms. *Id.* ¶ 8.

Minnesota ABC's mission is to provide the best training, government and legal representation, and programs to ensure that construction projects are awarded to the most qualified and responsible low bidder. *Id.* This follows from the merit shop philosophy, which encourages open competition and a free-enterprise approach to construction based solely on merit, regardless of labor affiliation. *See* Associated Builders and Contractors, Become a Member.[3] Minnesota ABC advocates for the merit-shop philosophy throughout

---

[3] http://www.mnabc.com/Membership.

Minnesota. In particular, Minnesota ABC has devoted significant resources to opposing project labor agreements, including the PLA provisions it challenges in this lawsuit. Compl. ¶ 9. In the last three years, Minnesota ABC has opposed four PLAs throughout Minnesota. *Id.*

Laketown Electric Corporation is a family-owned business based in Waconia, Minnesota. *Id.* ¶ 10. Laketown specializes in electrical services, *id.*, and is one of the fastest growing companies in Minnesota. *Id.* ¶ 3. Laketown has worked on several projects that are similar in size and scope to projects covered under the Minneapolis PLA. *Id.* ¶ 11. For example, Laketown routinely performs quality work in school districts that operate without a PLA. *See* Bergmann Decl. ¶ 3. Examples include a 3.4-million-dollar high school expansion in Prior Lake and two projects totaling over $2 million each in North St. Paul. Laketown is willing and able to bid on ongoing and anticipated projects that have incorporated the provisions of the PLA, and would do so if those projects were not covered by the PLA. Compl. ¶ 11.

Minnesota ABC and Laketown object to the terms of the Minneapolis PLA, including the PLA's Union Hiring Provision and its Fringe Benefits Provision.

**D.      Union Hiring Provision**

Hiring halls are arrangements in which an employer obtains employees through referrals from a union. *Id.* ¶ 46. An exclusive hiring hall is a hiring hall in which an employer exclusively hires employees referred by the union that operates the hiring hall. *Id.* ¶ 47. While the NLRA prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage

membership in any labor organization," 29 U.S.C. § 158(a)(3), the National Labor Relations Board has excused hiring hall discrimination in the form of a preference for workers with experience gained under a union's collective bargaining agreement. *See, e.g.*, *Interstate Elec. Co.*, 227 NLRB 1996 (1977).

The Minneapolis Project Labor Agreement, as adopted in ongoing construction projects in the school district, requires contractors to assent to a hiring hall. Compl. ¶ 39. Section 2 of Article III states that "[t]he hiring of employees shall be governed by the procedures set forth in the Agreements set in Schedule A." *Id.* Schedule A includes a list of labor unions that perform construction tasks, such as Boilermakers No. 647, Iron Workers No. 512, and Sheet Metal Workers No. 10. *Id.* ¶ 41. Contractors that assent to the projects that incorporate the terms of the 2004 Minneapolis PLA, whether unionized or not, must obtain their employees from the hiring halls of these and other unions, depending on their trade. *Id.* ¶ 49.

Contractors submit a list of needed employees to various hiring halls, and must accept the employees that the hiring halls send the contractors. These hiring halls often require contractors to employ workers that are not the contractors' own employees as well as union workers. *Id.* ¶ 50. This is a result of hiring hall procedures that select employees who have been waiting the longest on a Union's list. *See, e.g.*, *Inside Construction and Maintenance Agreement Between Minneapolis Chapter, National Electrical Contractors Association and the International Brotherhood of Electrical Workers, Local Union Number 292, AFL-CIO*, Section 4.14 (providing "Employers shall advise the Business Manager of the Local Union in writing of the number of applicants needed. The Business

- 8 -

manager shall refer applicants to the Employer by first referring applicants in Group 1 in order of their places on the 'Out of Work List'…") Ex. 14, Aff. Dan McConnell Supp. Mot. Dismiss, 7, ECF No. 33, Attach. No. 15. Contractors that are unsatisfied with the employees they obtain from the hiring hall must employ them anyway. There are significant penalties for backing out. Compl. ¶ 36.

### E.  Fringe Benefits Provision

The Minneapolis Project Labor Agreement, as adopted in ongoing construction projects in the school district, requires contractors to contribute to fringe benefit funds. Compl. ¶ 52 ("The Contractors agree to pay contributions to the established employee's benefit funds in the amount designated in the appropriate Schedule A."). Merit-shop contractors can establish their own benefits funds for their employees, and many merit-shop contractors, such as Laketown, do so. *Id.* ¶ 58. Even if a contractor has a pre-existing employee benefit fund for its employees, however, the Fringe Benefits Provision requires the contractor to contribute to another fringe benefit fund jointly administered by the signatory employers and the signatory union. *Id.* ¶ 59. Further, the fringe benefit funds established under the PLA can have multi-year vesting periods. *Id.* ¶ 55. Given the temporary nature of a PLA, the funds may inure to the benefit of the signatory union rather than the contractor's employees.[4]

---

[4] The funds may inure to the benefit of the signatory union for the reasons stated below (at 41-43). In all events, there are substantial factual disputes between the parties on the operation of the fringe benefits funds that make resolution improper at the pleadings stage.

### F.    Procedural History

Minnesota ABC and Laketown filed their federal civil rights lawsuit on March 12, 2019. *See* ECF No. 1. They allege that the Minneapolis Project Labor Agreement, as incorporated in ongoing projects, hampers contractors' ability to work on construction projects in the Minneapolis Public School District. In particular, the PLA terms prevent contractors from competing on an equal footing with their unionized counterparts, and forces them to fund speech with which they disagree. Minnesota ABC and Laketown raise challenges to the Union Hiring Provision under the Free Speech and Free Association Clauses of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. They also raise a challenge to the Fringe Benefits Provision under the First Amendment.

The Minneapolis Building and Trades Council (Union) intervened as a defendant soon after the lawsuit's filing. The Union filed its motion to dismiss under Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. The School District filed its separate motion to dismiss on the next day, incorporating the union's factual statement in full, and also moving to dismiss under Rules 12(b)(6) and 12(b)(1).

### STANDARD OF REVIEW

The School District and the Union file their motions to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 12(b)(6) authorizes the Court to dismiss a complaint if it fails to state a claim upon which relief can be granted. In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true all factual allegations in the complaint and draw[s] all

reasonable inferences in favor of the nonmoving party." *Missouri Broadcasters Association v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017) (quotations omitted). To survive the motion, a complaint must contain sufficient factual matter to permit the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* A court considering a Rule 12(b)(6) motion may analyze the complaint in its entirety, as well as documents and "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *United States ex rel. Ambrosecchia v. Paddox Labs., LLC*, 855 F.3d 949, 953 (8th Cir. 2017) (quotations omitted).

A motion filed under Rule 12(b)(1) tests whether the Court has jurisdiction to hear the claims in the complaint. "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack' [on jurisdiction]." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* (internal citations omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* (internal citation omitted).[5]

---

[5] Although it is unclear from Defendants' Motions, the fact that the Union Defendant attached documents from outside the pleadings suggests that Defendants are making both a factual attack and a facial attack on standing. To the extent that those documents are used for any purpose other than a factual attack on standing under Rule 12(b)(1) or are otherwise admissible under Rule 12(b)(6), *see Paddox Labs*, 855 F.3d at 953, Plaintiffs objects to the consideration of the documents at the pleadings stage.

## ARGUMENT

## I.    Plaintiffs Have Standing To Press Their Federal Civil Rights Claims

Minnesota ABC and Laketown have standing to assert their federal civil rights claims. To demonstrate Article III standing, a plaintiff must have (1) suffered an injury-in-fact that is both "concrete and particularized" and "actual and imminent," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Laketown Electric satisfies this requirement because the terms of the 2004 project labor agreements are incorporated verbatim into subsequent project bid specifications in the Minneapolis Public School District. Compl. ¶ 31. Therefore, Laketown must agree to practices that it contends are unconstitutional before it may submit a qualified bid on any of those projects. Minnesota ABC satisfies this requirement for two reasons. First, its members, including Laketown, are required to agree to unconstitutional terms before they may submit a qualified bid on a project. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (recognizing an association's right to sue as the representative of its members). Second, Minnesota ABC has standing to vindicate its own constitutional rights. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Finally, both Minnesota ABC and Laketown have standing to assert the claims of employees under the third-party standing doctrine.

### A.    Laketown Has Standing To Press Its Federal Civil Rights Claims

Laketown has standing. The challenged provisions of the project labor agreement, as incorporated in ongoing and anticipated projects, causes Laketown to suffer an injury in

fact that is concrete and particularized, and actual and imminent. *Lujan*, 504 U.S. at 560-61. As alleged in the complaint, Laketown suffers lost profits because it refuses to assent to the unconstitutional terms in the project labor agreement. *See* Compl. ¶ 84; *see also id.* ¶ 31 (enumerating a non-exhaustive list of ongoing projects in Minneapolis Public Schools). The incorporation of the 2004 PLA's terms in public projects in Minneapolis Public Schools for the last 15 years—and counting—costs Laketown millions of dollars per year in lost opportunities. Bergmann Decl. ¶ 4.[6] Although the Union attempts to downplay the injuries that non-union contractors like Laketown suffer, it is telling that the company would rather lose the opportunity to make millions of dollars than to agree to the PLA's terms. That Laketown has made this decision should come as no surprise, given that the PLA requires Laketown to employ workers that do not regularly work for it, and whose identities are unknown at the time that Laketown bids on a project. *Id.* ¶ 6.

The School District and the Union claim that these injuries are not "concrete and particularized" because plaintiffs have not submitted a bid. ECF No. 38 at 7. But this misunderstands the nature of Plaintiffs' injury. Plaintiffs are injured because there is a substantial likelihood that the challenged project labor agreement provisions, which have been repeatedly enforced in the past, will continue to be repeatedly enforced in the future.

---

[6] These declarations supplement the well-pled allegations in the complaint. *See Osborn*, 918 F.2d at 730 (parties may submit affidavits and other document on the court's jurisdiction to hear the case). Although Plaintiffs contend that the complaint contains sufficient allegations to establish their standing, if the Court were to conclude that any allegations within the declarations but not in the pleadings are essential, Plaintiffs would respectfully request leave to amend their complaint accordingly. *See* Fed. R. Civ. P. 15(a)(2) (courts "should freely give leave [to amend] when justice so requires").

*See Wooley v. Maynard*, 430 U.S. 705, 712 (1977) (plaintiffs have standing to bring claim for prospective relief based on the likelihood of statute being enforced against them in the future).

The Supreme Court's decision in *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 663 (1993), is instructive. The plaintiff in that case was an association of general contractors, which brought an equal protection challenge to a city ordinance according preferential treatment to certain minority-owned businesses in the award of municipal contracts. *Id.* at 658-59. Although the association's members had not bid on the contracts at issue, the Supreme Court held that they had suffered an injury-in-fact by "the inability to compete on equal footing in the bidding process, not the loss of a contract." *Id.* at 666. Thus, contractors raising a claim of racial discrimination can establish an injury by "demonstrat[ing] that [they are] able and ready to bid on contracts and that a discriminatory policy prevents [them] from doing so on an equal basis." *Id.* This well-settled rule of standing is no different when a plaintiff claims discrimination on the basis of viewpoint and union affiliation. *See Associated Gen. Contractors of Am. v. Metropolitan Water Dist. Of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1988) (contractors established the requisite injury-in-fact by alleging that they were able and ready to bid on public construction projects but that the district's PLA requirement deterred them from doing so).

Laketown is thus not required to submit a bid before it is able to mount its constitutional challenge. And there are good reasons it has not. A contractor must perform costly and time-intensive pre-bid work on projects for which it intends to submit a bid. *See*

Compl. ¶ 35. Further, a successful bidder that is dissatisfied with workers assigned to it through the hiring hall cannot back out of the agreement without facing significant penalties. *See id.* ¶ 36.

The School District's argument that Laketown lacks standing because it has not received workers from a hiring hall or contributed to a fringe benefit fund is meritless. *Contra* ECF No. 38 at 7. Citing the Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 (2013), the School District asserts that Plaintiffs' injury rests on a "speculative chain of possibilities." *Id.* Not so. First, the challenged PLA provisions directly injure Laketown because they require Laketown to assent to unconstitutional terms before Laketown may submit a qualified bid for a covered project. Second, there is no dispute that these PLA provisions are incorporated into ongoing construction projects in the Minneapolis Public School District, nor any dispute that the provisions require successful bidders to hire workers from union hiring halls and contribute to fringe benefit plans. There is nothing speculative or attenuated about the injury that Laketown claims here. A plaintiff need not compound an existing injury before she may seek relief from a federal court.[7]

_____

[7] Although it is also appropriate to challenge an individual project that has incorporated terms from the Minneapolis PLA, Plaintiffs do not do so here for two reasons. First, waiting to sue on one particular opportunity is impracticable, given the short duration of the bidding process. Second, and more importantly, the fact that the same PLA terms are incorporated into several ongoing and anticipated projects in the school district compounds Plaintiffs' injuries, given that merit-shop contractors are effectively unable to bid on all of those projects. They therefore seek prospective injunctive relief to enjoin Defendants from incorporating the unconstitutional PLA provisions in the future.

Although Defendants rest their standing arguments on injury, the other elements of standing are met here as well. The School District adopts the challenged PLA terms in ongoing projects in the Minneapolis Public School District. The School District, ostensibly aided by the Union, executes and enforces the PLA. Plaintiffs' injury is thus "fairly traceable" to the School District and will likely be redressed by a favorable decision from this Court. *City of Jacksonville*, 508 U.S. at 663-64.

**B.    The Association Has Standing To Press Its Federal Civil Rights Claims**

    **i.    The Association Has Standing To Sue as the Representatives of Its Members**

Minnesota ABC has standing to sue as the representative of its members. An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests [Minnesota ABC] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Association's lawsuit satisfies all three factors. First, Minnesota ABC's members have standing to sue in their own right. Laketown Electric is a member of Minnesota ABC and, as demonstrated above, has standing to press the same constitutional claims. Second, the interests that Minnesota ABC seeks to protect are germane to the organization's purpose. As described in the complaint (and in the following subsection), the Association's "mission is to promote and defend the merit shop philosophy, which encourages open competition and a free-enterprise approach to construction based solely

on merit," and not on "labor affiliation." Compl. ¶ 3. Third, neither the claim asserted nor the relief requested requires the participation of individual members, because Minnesota ABC "seeks only declaratory and prospective injunctive relief." *Heartland Academy Community Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005).

### ii.    The Association Has Standing To Sue in Its Own Right

Minnesota ABC has standing to sue in its own right because it "devote[s] significant resources to identify and counteract" the School District's unlawful practices. *Havens*, 455 U.S. at 379. As described in the complaint, Minnesota ABC provides "government and legal representation" to "ensure members a competitive advantage, and ensure that construction projects are awarded to the most qualified and responsible low bidders." Compl. ¶ 8. To that end, Minnesota ABC has had to devote significant resources for the particular purpose of "counteracting the project labor agreement provisions challenged herein, and similar project labor agreements across Minnesota." *Id.* ¶ 9. For example, "Minnesota ABC has actively opposed project labor agreements for years, and has advocated against four project labor agreements in the last three years." *Id.*

The complaint contains allegations that are more than sufficient to establish the Association's injury at the motion to dismiss stage. The declarations provide even more detail on that score. Minnesota ABC has expended substantial time and money to counteract project labor agreements throughout Minnesota. *See* Hanson Decl. ¶¶ 5-12. Minnesota ABC has drafted letters to government officials, action alerts to constituents, and took out advertisements on billboards and newspapers opposing project labor agreements throughout Minnesota. *Id.* In Minneapolis, Minnesota ABC's leadership has

spent hours meeting with government officials and communicating electronically in an effort to persuade Minneapolis Public Schools to reconsider its use of the challenged PLA.

The Union rests its opposition on this point on the Eighth Circuit's decision in *Arkansas ACORN Fair Housing v. Greystone Development Ltd. Co.*, 160 F.3d 433 (8th Cir. 1998). That case does not help the Union. There, the Eighth Circuit found that ACORN could not establish standing under *Havens*. *Id.* at 434. The Court reasoned that "[w]hile the deflection of an organization's monetary and human resources from counseling and educational programs to legal efforts aimed at combating discrimination . . . is itself sufficient to constitute an actual injury, the injury must also be traceable to some act of the defendant." *Id.* (internal citations omitted). Here, however, Minnesota ABC alleges that it has devoted significant resources to "counteract[] the project labor agreement provisions challenged herein," Compl. ¶ 8, and provides further evidence through its declaration. The School District and the Union are signatories to the challenged project labor agreement, so there is no question that Plaintiffs' injury is traceable to Defendants' actions.

The Eighth Circuit's decision in *ACORN* also came at a different procedural posture. In particular, the Court cited the heightened standard for establishing standing at the summary judgment stage and explained that "ACORN cannot satisfy its burden at the summary judgment stage to establish the injury in fact requirement for standing . . . ." *ACORN*, 160 F.3d at 435. At this pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice . . . ." *Lujan*, 504 U.S. at 561. Minnesota ABC has satisfied its pleading burden.

### C.    Plaintiffs Have Third-Party Standing To Sue on Behalf of Their Employees

As stated above, Plaintiffs have standing to vindicate their own constitutional rights. Beyond that, Laketown and other contractors that are members of Minnesota ABC may properly seek to vindicate the constitutional rights of their employees. After all, an employer's success both originates from the success of its employees and inures to the benefit of those employees.

A plaintiff may litigate the interests of a third party where (i) the plaintiff has Article III standing in his own right, (ii) the plaintiff has "a close relation" to the third party, and (iii) there is "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991).[8] Minnesota ABC and Laketown satisfy this standard. First, as explained above, they have Article III standing in their own right. Second, the interests of Minnesota ABC's members, including Laketown, are closely related to those of their employees. For instance, contractors that agree to hiring halls must "employ workers that are not the contractors' own employees." Compl. ¶ 50. And the fringe benefit fund that contractors must pay into "does not guarantee that a contractor's employees will collect the benefits. . . ." *Id.* ¶ 54. *See also id.* ¶ 55 (funds established under PLA can have "multi-year vesting periods" and may "inure to the benefit of the signatory union rather than the contractor's employee"). Third, employees face "some hindrance" in bringing their own lawsuit. *Powers*, 499 U.S. at 411. "[A]n absolute impossibility of suit"

---

[8] The third-party standing doctrine is a prudential limitation on the Court's jurisdiction. *See Ben Oehrleins and Sons and Daughters, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1378 (8th Cir. 1997).

is not necessary to meet this requirement and "a practical disincentive may suffice." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 n.4 (3d Cir. 2002). Here, employees may not be able to bear "the economic burdens of litigation." *Powers*, 499 U.S. at 414-15. They may fear retaliation from the Union, or not understand the intricacies of project labor agreements. These barriers are sufficient to serve as a practical disincentive to bringing suit. Therefore Plaintiffs' action may proceed on the basis of third-party standing as well.

## II.    Plaintiffs State A Claim That the Union Hiring Provision Is Unconstitutional

### A.    Plaintiffs State A Claim That the Union Hiring Provision Violates the Free Speech Clause of the First Amendment

The Union Hiring Provision violates the Free Speech Clause of the First Amendment because it favors union viewpoints.[9] A regulation discriminates on the basis of viewpoint if it targets "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint regulation is an "egregious form of content discrimination," and as such is "presumptively unconstitutional." *Id.* at 829, 831.

This constitutional protection reaches government action in its proprietary capacity just as it reaches government action in its regulatory capacity. It could hardly be otherwise. The government routinely undertakes public projects such as roads, schools, and so on. Yet the Equal Protection Clause fully prevents the government, acting as a proprietor, from

---

[9] The First Amendment's Free Speech Clause is incorporated against state and local governments through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

discriminating on the basis of race in the bidding process. *See City of Jacksonville*, 508 U.S. at 663-64 (government acting in proprietary capacity). So too, the Free Speech Clause prevents the government, acting as a proprietor, from discriminating on the basis of viewpoint.

Political patronage is one form of viewpoint discrimination. Patronage "unquestionably inhibits protected belief and association." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990) (citing *Elrod v. Burns*, 427 U.S. 347, 359 (1976)). Thus, "[a]bsent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression." *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996). This prohibition extends to several related political patronage practices, including hiring decisions. *Rutan*, 497 U.S. at 65. Plaintiffs who miss out on public employment opportunities need not prove that they have "been coerced into changing, either actually or ostensibly, their political allegiance." *Id.* at 71 (quoting *Branti v. Finkel*, 445 U.S. 507, 517 (1980)). Rather, they need show only that the government failed to consider them for employment because they were not affiliated with or sponsored by the favored party. *See id.*

Discrimination based on union membership therefore violates the First Amendment. *See State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 134 (2d Cir. 2013). As the Second Circuit explained, labor unions are "predicated on ideas of worker solidarity that are as much political as economic." *Id.* By the same token, opposition to labor unions has been based not only on the perceived economic interests of employees, consumers, and workers, but on "the perception that unions advocate radical political ideas." *Id.* Thus, the

government may not condition hiring decisions based on union membership "unless the government has a vital interest in doing so." *Rutan*, 497 U.S. at 78; *cf. Elrod*, 427 U.S. at 372 (patronage employment decisions are only permissible for "policymaking positions").[10]

Here, the Union Hiring Provision discriminates against non-union contractors and employees. It discriminates against non-union contractors because it forces them to agree to hire their employees from union hiring halls. Compl. ¶ 49. These hiring halls encourage union membership. *See NLRB v. Local 334, Laborers Int'l Union of North America, AFL-CIO*, 481 F.3d 875, 880 (6th Cir. 2007). Although the National Labor Relations Act ostensibly prohibits certain forms discrimination in employee referrals from the hiring hall, *see* 29 U.S.C. § 158(a)(3), the Act does not provide the full protections required by the First Amendment. *See Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 674-75 (1961). For example, the NLRA "does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." *Id.* Union hiring halls allow unions to give a preference for workers who have gained experience under the unions' collective bargaining agreement. Compl. ¶ 51. The Union Hiring Provision therefore discriminates in at least two ways. First, it favors union members who are more likely to have experience under a union's collective bargaining

---

[10] Of course, policymaking positions are not at issue in this case.

agreement.[11] Second, it encourages workers to join a union, so they may gain seniority under a union's collective bargaining agreement.

Hiring halls require contractors to employ workers that are not the contractors' own employees. Compl. ¶ 50. Contractors who are unsatisfied with the workers who are assigned to them incur significant penalties if they refuse to employ such workers on a project. *Id.* ¶ 36. The burdens are significantly higher for merit-shop contractors, who do not operate hiring halls under the PLA and are significantly less likely to be familiar with workers from union hiring halls. Bergmann Decl. ¶ 6. Further, contractors who agree to go through hiring halls must allow unions to solicit their employees. *Id.* ¶ 7.

The Union contends that there is no plausible allegation of discrimination "when non-union contractors are expressly allowed to work under the PLA and when applicable law provides that their employees do not have to be union members or join the union." ECF No. 32 at 17. That misses the point. A defendant may not defeat a claim of discrimination merely by showing that the discrimination does not constitute a categorical bar. In the equal protection context, for example, a public university has never been able to shield its admissions policy from scrutiny merely by showing that students of any race may apply and attend a university. *See Gratz v. Bollinger*, 539 U.S 244, 253-57 (2003) (describing challenged admissions policy). Instead, the Supreme Court has held that strict scrutiny applies whenever the government distributes benefits and burdens on the basis of race. *See id.* at 270. Here, Courts and commentators alike have noted the coercive effect

---

[11] Because collective bargaining is itself a political issue, a provision that favors those who are regular parties to collective bargaining is itself political discrimination.

that hiring halls can have on workers. Even in *Master Builders Iowa Inc. v. Polk Cty.*, a case which upheld a project labor agreement, the Iowa Supreme Court cited the decades-old notion that "[o]ne need not be a cynic to observe that a union which bears the burden of maintaining a hiring hall or referral system with be tempted to favor its adherents or prospective adherents when employment opportunities arise." 653 N.W.2d 382, 392 n.4 (Iowa 2002) citing Jerome D. Fenton, *Union Hiring Halls under the Taft-Hartley Act*, 9 Lab. L.J. 505, 506-07 (1958). Indeed, an "employer who makes an exclusive delegation of clearance or referral for employment to a union would indeed be naïve if he did not anticipate this result." *Id.* The dissent agreed with the majority's skepticism that the non-discrimination provision will serve as an adequate safeguard to one's constitutional rights. *Id.* at 400 (Larson, J., dissenting). It noted that despite "a provision in the PLA that prohibits the hiring hall from discriminating against nonunion workers," it would be "easy for union personnel to prefer their own members over nonunion workers on the subjective ground they are more qualified." *Id.* These concerns are borne out in practice. It is telling that the Union was only able to come up with two merit-shop contractors that have agreed to the terms of the PLA, which have been incorporated in public projects in the district for the last 15 years. *Compare* ECF No. 33 at 4 ¶ 5, *with* Compl. ¶ 31.[12]

---

[12] One of the two contractors the Union mentions has submitted a declaration testifying that, after her experience with the project labor agreement, she now refuses to bid on a project covered by a PLA. Mehr Decl. ¶ 3.

None of the cases that the Union cites is on point. The plaintiffs in *Hanten v. School District of Riverview Gardens*, 183 F.3d 799 (8th Cir. 1999), did not raise a free speech claim, and the Eighth Circuit had no occasion to address it.[13] The Union also is mistaken in contending that there is no First Amendment violation because the PLA does not force contractors to host or endorse the Union's message. ECF No. 32 at 17. The authorities the Union cites to support that contention, however, are far afield from Plaintiffs' free speech claim. The Union's cited cases hold that one's First Amendment right is not violated simply by allowing others (who express contrary views) access to one's property on the same terms as everyone else. *See Rumsfeld v. Forum for Academic and Institutional Rights (FAIR)*, 547 U.S. 47, 51 (2006) (requiring schools receiving federal funds to provide "military recruiters access equal to that provided other recruiters"); *Pruneyard v. Robins*, 447 U.S. 74, 83 (1980) ("The PruneYard is a large commercial complex that . . . is open to the public at large."). A law that requires equal access can hardly discriminate on the basis of viewpoint. Government action that requires workers to come from Union hiring halls, however, is facially discriminatory. Finally, the Union argues that cases like *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996), do not apply because the PLA applies to private employees, not public employees. ECF No. 32 at 18. Yet the First Amendment is applicable here because it is a government actor that is discriminating on the basis of viewpoint. No one would say that the government could use race to select the "private employees" it wishes to work on its projects. *See City of Jacksonville*, 508 U.S. at

---

[13] The *Hanten* Court did rule against Plaintiffs' free association and due process claims. But, as explained below, the decision is distinguishable as to those claims as well.

663-64. Just as the Fourteenth Amendment prohibits discrimination on the basis of race, the First Amendment prohibits discrimination on the basis of viewpoint.

The School District makes a similar argument. ECF No. 38 at 13-14. Citing *Hanten*, the School District contends that "no inference case fairly be drawn that any of the plaintiffs were targeted by the defendants for their nonunion association or views." *Id.* at 34. Again, *Hanten* did not address a free speech claim, and the district misapprehends the free speech issues in this case. The First Amendment does not only prohibit the government from retaliating against a Republican for making a particular stump speech, it also prohibits the government from favoring Democrats because of their viewpoints. Although the classic example of political patronage comes in the form of favoring one political party over the other, the prohibition on such patronage extends to favoring union members over non-union members as well. *See Rowland*, 718 F.3d at 134 (observing that unions are predicated on political ideas).

Although Minnesota ABC furthers its mission by advocating in favor of free-market principles and against project labor agreements, *see* Compl. ¶ 3, there is no requirement that a contractor even express a certain viewpoint to plead a claim of political patronage under the First Amendment. In *Galli v. New Jersey Meadowlands Commission*, the Third Circuit held that the First Amendment rights of speech and association protect government employees who lacked a political affiliation from political patronage discrimination. 490 F.3d 265, 268 (3d Cir. 2007). The Third Circuit first recited the doctrine articulated in *Rutan* and similar cases that employers are allowed to make employment decisions based on political affiliation only when "policymaking" positions are at issue. The circuit court

then overruled the district court's decision denying the plaintiff relief because "she was neither compelled to participate in the Democratic Party nor forced to keep her true beliefs to herself." *Id.* at 273. Instead, the mere act of making positions available for political supporters could amount to political discrimination. *Id.* In the same way here, regardless of the political viewpoints of any given contractor, the First Amendment rights of contractors are violated by the PLA's provisions that require adherence to closed-shop policies.

### B.    Plaintiffs State A Claim That the Union Hiring Provision Violates the Free Association Clause of the First Amendment

The Union Hiring Provision violates the Free Association Clause of the First Amendment. The First Amendment protects "a right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). The freedom to associate is crucial for "preserving political and cultural diversity and shielding dissident expression from suppression by the majority." *Id.* It ensures that neither a majority nor a popular minority can force its views on groups that choose to express unpopular ideas. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 647-68 (2000).

The government may infringe the freedom to associate in more than one way. It may do so by "interfer[ing] with the internal organization or affairs of the group." *Roberts*, 468 U.S. at 623. And it may do so by "impos[ing] penalties or withhold[ing] benefits from individuals because of their membership in a disfavored group." *Id.* at 622. The Union Hiring Provision does both.

### i. The Union Hiring Provision Interferes with the Internal Organization or Affairs of Minnesota ABC and Laketown

"There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* at 623. After all, the freedom to associate "plainly presupposes a freedom not to associate." *Id.* In *Boy Scouts of America v. Dale*, the Supreme Court held that a state public accommodation law, which required the Boy Scouts to accept a homosexual scoutmaster, violated its freedom of expressive association. 530 U.S. at 655-59. The Court used a three-step inquiry to reach this conclusion. *Dale*, 530 U.S. at 649-56. First, it determined that the Boy Scouts was an expressive association because its purpose was to "instill values in young people." *Id.* at 649-50. Next, the Court evaluated "whether the forced inclusion of [unwanted] members would significantly affect the [organization's] ability to advocate public or private viewpoints." *Id.* at 650. Finally, the Court examined whether the organization's First Amendment claim survived strict scrutiny. *Id.* at 655-56.

Plaintiffs have stated a proper Free Association claim under the *Dale* framework. First, Plaintiffs are expressive associations. Minnesota ABC's mission is "to promote and defend the merit-shop philosophy." Compl. ¶ 3. It accomplishes this goal by advocacy. As the complaint alleges, Minnesota ABC has actively opposed project labor agreements for years, and has advocated against four project labor agreements in the last three years. Minnesota ABC's declaration expands on those allegations, explaining that the Association spends resources meeting with constituents and government officials on project labor agreements, and taking out ads highlighting the adverse effects of PLAs. *See* Hanson Decl.

¶¶ 5-12. Similarly, Laketown proudly and publicly boasts that it started out in the 1970s as a union contractor, but after the "union rejected [a family member] in 1981, [Laketown] left the union and became a merit-shop contractor."[14] It is true that Laketown is a contractor that specializes in electrical services. But that hardly detracts from its First Amendment claim. As the Third Circuit observed, "[t]he expansive notions of expressive association used in *Roberts* and *Dale* demonstrate that there is no requirement that an organization be primarily political (or even primarily expressive) in order to receive constitutional protection for expressive associational activity." *See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000).

Second, the forced inclusion of unknown workers from the hiring hall would significantly affect Plaintiffs' ability to advocate for their viewpoints. Laketown prides itself in being a merit-shop contractor. Minnesota ABC promotes and defends the merit-shop philosophy through its advocacy throughout Minnesota. If Laketown were to agree to allow unions to pick Laketown's employees through union hiring halls, that decision would, to say the very least, invite cynicism concerning Laketown's merit-shop philosophy.

Finally, infringements on expressive association are subject to strict scrutiny. *See Christian Legal Society v. Walker*, 453 F.3d 853, 861-62 (7th Cir. 2006). The right "may be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive

---

[14] https://www.laketownelectric.com/about/

of associational freedoms." *Dale*, 530 U.S. at 648 (internal quotation marks omitted). The Union Hiring Provision fails that scrutiny. Defendants have not attempted to meet that standard in their motions. In any event, because this standard places the burden on the government to justify its infringement on the First Amendment, Defendants cannot meet this burden at the pleading stage.

The Court's decision in *FAIR* does not help Defendants. There, the Court held that the federal government could withhold federal funds to universities and law schools that denied military recruiters access equal to that provided to other recruiters. *See FAIR*, 547 U.S. at 51. The enabling statute did not violate a First Amendment right to association because "[a] military recruiter's mere presence on campus" did not significantly affect a law school's right to associate and "nothing about the statute affects the composition of the group by making group membership less desirable." *Id.* at 70. By contrast, the Union Hiring Provision requires merit-shop contractors to forgo their own employees in favor of employees recommended to them by union hiring halls. The provision thus alters significantly the composition of merit-shop contractors like Laketown. And it makes membership as a merit-shop contractor less desirable because it effectively limits the opportunities available for those contractors if they were to adhere to their merit-shop philosophy.

## ii.    The Union Hiring Provision Imposes Penalties and Withholds Benefits Based on Membership in a Disfavored Group

The Government also violates the Free Association Clause when it "impose[s] penalties or withhold benefits based on membership in a disfavored group." *Healy v. James*, 408 U.S. 169, 180-84 (1972). Union membership is protected by the right of association under the First Amendment. *Steckelberg v. Rice*, 184 F. Supp. 3d 746, 757 (D. Neb. 2016). Courts have recognized that that right "would be meaningless unless an employee's right to participate in union activities was also recognized." *Id.* By the same reasoning, the right not to join a union is also protected by the right of association under the First Amendment, and that right would be meaningless unless a person could exercise it without inviting retribution.

Here, Minneapolis Public Schools gives the Union a host of benefits in the project labor agreement. Among these benefits is the ability to operate a hiring hall to refer workers for the project. As the Sixth Circuit has recognized, such arrangements encourage union membership and, by implication, discourage dissociation from the Union. *See NLRB v. Local 334, Laborers Int'l Union of North America, AFL-CIO*, 481 F.3d at 880.

Defendants rely primarily on the Eighth Circuit's decision in *Hanten v. School District of Riverview Gardens*, 183 F.3d 799, in their motions. *See* ECF No. 32 at 11-19; ECF No. 38 at 10-11. Defendants overstate *Hanten*'s applicability to this case. In *Hanten*, the Eighth Circuit held that a school district's preference for union labor did not violate the constitutional right of non-union employees to freely associate. *Id.* at 800.

*Hanten* is inapposite for several reasons. First, the Eighth Circuit emphasized that the complaint in *Hanten* "fail[ed] to allege in nonconclusory terms that the union preference [was] likely to 'directly or substantially interfere' with the rights of [the subcontractor's] employees." *Id.* at 806. The court noted several omissions in the complaint, including the absence of allegations showing that "any of the employees lost wages or were likely to suffer wage losses as a result of the preference." *Id.* Here, however, Laketown alleges that it suffers lost profits reaching upwards of millions of dollars because it refuses to agree to PLA terms that it believes are unconstitutional, Compl. ¶ 84, and would incur additional costs if it were to agree to those terms. *Id.* ¶ 85. *See also* Bergmann Decl. ¶ 4. The same harm flows to the employees. Lost profits can result in wage losses. Further, Laketown "already establishes profit sharing for its employees." *Id.* ¶ 8. Second, the Eighth Circuit concluded that rational basis review was proper only after determining that the plaintiffs in *Hanten* failed to allege direct or substantial interference with their right to associate. That does not change the fact that strict scrutiny is appropriate where, as here, Plaintiffs have made such allegations. *See Dale*, 530 U.S. at 655-56. Finally, *Hanten* had no occasion to consider the use of a union hiring hall. Even if there were a rational basis in a preference for union labor, Defendants have not explained how a union hiring hall furthers a legitimate government interest. Given Defendants' refrain that hiring halls do not discriminate against employees, *see* ECF No. 32 at 12, it fails to explain exactly how "the PLA's hiring hall procedures are rationally related to the legitimate governmental purpose of providing for a substantial supply of skilled labor for the School District's projects." *Id.* at 14-15.

### C.  Plaintiffs State A Claim That the Union Hiring Provision Violates the Equal Protection Clause of the Fourteenth Amendment

Plaintiffs state a claim that the Union Hiring Provision violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment because they discriminate against non-union parties without any relation to any legitimate government state interest. *See* Compl. ¶¶ 87-96.

Government action that discriminates is, at a minimum, subject to rational basis review.[15] *Holt v. Howard*, 806 F.3d 1129, 1132 (8th Cir. 2015). Although the rational basis test is lenient, it does not immunize all government economic regulation from constitutional attack. Plaintiffs must be given the opportunity to rebut the government's claim that a law is rationally related to a legitimate state interest. Thus, "[b]ald assertions that [challenged laws] are reasonable cannot be considered" on a motion to dismiss. *Keenon v. Conlisk*, 507 F.2d 1259, 1261 (7th Cir. 1974); *Merrifield v. Schwarzenegger*, No. 04-0498 MMC, 2004 WL 2926161, at *5 (N.D. Cal. July 16, 2004) ("[T]he issue of whether the Legislature lacked a rational basis" for a challenged law "is premature" at the motion to dismiss stage.").

Whether a statute in fact bears a rational relationship to a legitimate state interest is a matter to be determined after discovery and fact finding, not on a motion to dismiss where the plaintiff's allegations must be presumed true. *See Zamani v. Carnes*, 491 F.3d 990,

---

[15] Because the Union Hiring Provision discriminates on the basis of viewpoint, a higher standard is appropriate under the First Amendment. *See Rosenberger*, 515 U.S. at 830. But even if the Court were to review the Union Hiring Provision under the rational basis test, it should still deny Defendants' motions to dismiss.

996 (9th Cir. 2007) ("The relevant inquiry for a 12(b)(6) motion is not whether the plaintiff has demonstrated a likelihood of success on the merits.").  In order to survive a motion to dismiss, a plaintiff pursuing an equal protection claim need only "allege facts sufficient to overcome a presumption of government rationality."  *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995).

Plaintiffs contend that favoring workers from hiring halls is irrational because employees from merit-shop contractors like Laketown are just as skilled.  *Id.* ¶¶ 90, 91.  It further alleges that hiring from union halls does not prevent work stoppages and, in any event, those stoppages could be resolved through contractual provisions with non-union parties. *Id.* ¶ 96.  This shows that the Union Hiring Provision is irrational, and a product of animus or impermissible viewpoint discrimination.  If these allegations are taken as true, as they must be on motion to dismiss, Plaintiffs have stated a claim for relief under the Equal Protection Clause. Protecting a discrete interest group from economic competition is not a legitimate governmental interest. *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002).

Defendants argue that the claim must be dismissed because the law is "rational."  It suggests that the union hiring requirements satisfy the rational basis test because they prevent work stoppages, ensure timely completion, maintain workplace harmony, and guarantee skilled labor.  ECF No. 32 at 14; ECF No. 38 at 10-11. These arguments are both unpersuasive and inappropriate at the motion to dismiss stage.

While preventing work stoppages, ensuring timely completion, ensuring workplace harmony, maintaining skilled labor may be legitimate state interests in and of themselves,

whether the challenged practices are rationally related to those ends is a question of fact. Plaintiffs have adequately alleged that the Union Hiring Provision is not related to those ends, and Defendants counter that argument with speculation and studies that need to be further examined. *See* ECF No. 32 at 4 n.1.[16]

Plaintiffs should be afforded the opportunity to rebut those assertions through discovery, so they may prove that the Union Hiring Provision is not related to the government's stated purposes, or any other legitimate state interest. On their face, the requirement does not in fact prevent work stoppages, ensure timely completion, create workplace tranquility, or maintain a certain level of skill.

Further, as the Supreme Court has held, "[w]here the existence of a rational basis . . . depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry," and a law may be proven unconstitutional by "showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) (citations omitted); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("[P]arties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational . . . ." (citation omitted)). Indeed, district courts have even convened full-scale trials to determine whether economic regulations are in fact rationally related to a legitimate government interest. *See, e.g.*, *Craigmiles v. Giles*, 110 F. Supp. 2d 658, 664 (E.D. Tenn. 2000), *aff'd*, 312 F.3d 220 (6th Cir. 2002). The Union Hiring Provision is based on

---

[16] This Court should decline the Union's invitation to consider the studies at the pleadings stage.

antiquated notions from the 1950s that the union has access to the best workers. *See Pittsburgh Press Co.*, 977 F.2d at 656. Whatever the merits of that assertion in the 1950s, it is extremely dubious today. At least two dozen states and counting have adopted state-bans on project labor agreements that contain provisions similar to the Union Hiring Provision. *See* Compl. ¶ 23. Those states are ostensibly also interested in expending funds in ways to prevent work stoppages and facilitate the timely completion of public works. But the fact that state after state has adopted bans on similar project labor agreements tends to show that Defendants rely on faulty rationale for adopting the project labor agreements. Further, experience from those states, as well as the federal level, provides mounting evidence that the Union Hiring Provision is an ineffective means by which to reach the district's desired ends. *See, e.g.*, Compl. ¶ 21. Plaintiffs should be afforded the opportunity to prove that, even if the Union Hiring Provision was once rationally related to a legitimate state interest, it no longer is today.[17]

**D.    Plaintiffs State A Claim That the Union Hiring Provision Violates the Due Process Clause of the Fourteenth Amendment**

The Due Process Clause protects a person's constitutional right to earn a living without unreasonable government interference. *Greene v. McElroy*, 360 U.S. 474, 492

---

[17] These changed circumstances also distinguish this case from *Hanten*. In 1999, only two states enacted bans on government-mandated PLAs. *See supra* n.1. Today, half of the states ban government-mandated PLAs. *See id.* The Eighth Circuit's decision in *Higgins Elec., Inc. v. O'Fallon Fire Protection Dist.*, 813 F.3d 1124, 1129-30 (8th Cir. 2016) is similarly unhelpful. *Higgins* considered only a "class of one" equal protection claim. *See id.* Its due process analysis suggested it analyzed procedural due process claims, *see id.* (discussing property rights), and its analysis on the association claim stated that the plaintiff there, unlike Plaintiffs here, did "not provide any plausible account of how the District interfered with Higgins's ability to associate . . . ." *Id.* at 1130.

(1959). Defendants misapprehend Plaintiffs' claim as a procedural due process claim. ECF No. 38 at 11. Their citation of *Hanten*, which squarely involved a procedural due process claim, highlights their confusion. *See Hanten*, 183 F.3d at 808-09 (noting the elements plaintiffs must meet to establish a procedural due process violation). In fact, Plaintiffs bring a substantive due process challenge to the Union Hiring Provision. Although the government has broad authority to protect public health or safety, substantive due process requires that any restriction on a person's right to earn a living be rationally related to some legitimate government interest. *Greene*, 360 U.S. at 492. Government restrictions on one's right to earn a living violate the Due Process Clause where they do not further a legitimate government interest, or where they are only tangentially related to that interest. *See, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013).[18]

The Union Hiring Provision violates the Due Process Clause, because it forces contractors to obtain their employees from union hiring halls if they wish to work on public projects in the Minneapolis Public School District. Laketown, for example, works on public projects throughout the state of Minnesota, including multi-million-dollar projects minutes away in the North St. Paul School District. Bergmann Decl. ¶ 3. Yet Laketown is prohibited from working on covered projects in Minneapolis Public Schools unless it agrees to forgo using its regular and trusted employees and instead obtains unknown workers from union hiring calls.

---

[18] The Fourteenth Amendment applies to government's arbitrary restrictions on a right to earn a living when the government is acting in its proprietary capacity just as it applies when the government is acting in its regulatory capacity. *See City of Jacksonville*, 508 U.S. at 663-64.

As stated above (at subsection c), this restriction on a contractor's right to earn a living serves no legitimate government interest. Defendants have not produced any competent evidence that the Union Hiring Provision prevents work stoppages, ensures timely completion of projects, or furthers any of the interests that Defendants assert here. Several states have banned the use of project labor agreements altogether, so one would expect that the evidence of disparities would be readily available. In all events, both parties should have their opportunity to produce the relevant evidence at the appropriate time; the case should not be resolved on the pleadings.

III.    **Plaintiffs State A Claim That the Fringe Benefits Provision Violates the First Amendment**

The Fringe Benefits Provision violates the First Amendment. Like many other employers, contractors can establish their own benefit funds for their own employees. Compl. ¶ 58. Many merit-shop contractors, such as Laketown, do so. *Id.* Yet the Fringe Benefits Provision requires contractors to pay into fringe benefit funds established under the PLA, even if the contractor already administers a fund that provides the same benefits. *Id.* ¶ 59.

The Fringe Benefits Provision violates the First Amendment's prohibition against compelled speech. *Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S. Ct. 2448, 2459-60 (2018), is instructive. The Court there examined an agency-fee arrangement that required non-union members to pay for various union expenses such as lobbying, advertising, membership meetings and conventions, litigation, and other unspecified services that "may ultimately inure to the benefit of the members of

the local bargaining unit." *Id.* at 2461. The Court held that the arrangement violated the First Amendment because it compelled persons to subsidize the speech of others. *Id.* at 2464. In reaching this decision, the Court invoked decisions recognizing a "significant impingement on First Amendment rights" when "public employees are required to provide financial support for a union that 'takes many positions during collective bargaining that have powerful political and civic consequences.'" *Id.* (quoting *Knox v. Service Employees*, 567 U.S. 298, 310-11 (2012)).

The same is true here. Contractors must agree to pay into fringe benefit plans established under the PLA before they are permitted to submit a qualified bid on a public project. Money is fungible. Unions routinely promise their members greater fringe benefits such as vacation, health care, and so forth; the Fringe Benefits Provision allows those members to get those benefits on the contractor's dime.[19] The fringe benefits may be themselves political but, in addition, the funds free up union money for other activities, such as lobbying, advertising, and other activities that ultimately benefit the Union and its members. *Id.* ¶ 99.

Defendants offer several purported distinctions in an effort to escape *Janus*. None has merit. First, Defendants claim that *Janus* cannot apply outside of the context of public employment. *See* ECF No. 32 at 19-20; ECF No. 38 at 14-15. In raising this argument, the Union cites the Supreme Court's observation that, "[i]n the public sector, core issues such as wages, pensions, and benefits are important political issues, but that is generally not so

---

[19] As stated, merit-shop contractors who go through union hiring halls must accept union workers to which they are assigned. Compl. ¶ 50.

in the private sector." *Harris v. Quinn*, 573 U.S. 616, 636 (2014). That argument is a poor fit here. Private sector union activities generally do not involve political speech, because there is no government involvement. On the contrary, the PLA provisions here were negotiated by a government entity: the School District.

Defendants also contend that funds must accrue to the benefit of the employees, but fail to explain how that fact alone makes fringe benefits any less political. The benefits run the gamut from vacation and health care to apprenticeship and training funds. It would be far from surprising for discovery to reveal the political nature of those benefits. *See* Hanson Decl. ¶ 13. Moreover, the fringe benefit funds have long vesting periods. Compl. ¶ 55. And there are concerns that many multi-employer pension funds are in dire condition. *See* John Magnanaro, *Congress Urged to Act Soon on Union Pension Funding Crisis* (PLANSPONSOR, May 15, 2019).[20] As a result, the benefits might not inure to the benefit of the contractor's employees. These critical factual issues highlight the need for discovery and show that dismissal is improper.

In all events, the distinction between political and non-political matters quite little after *Janus*. Before *Janus*, the Supreme Court held that unions may collect, from non-members, chargeable expenses such as those germane to a union's collective bargaining activities. *Harris*, 573 U.S. at 636. The Court distinguished between those expenses and non-chargeable ones, which involve expenses related to a union's political or ideological activities. *Id.* In *Janus*, however, the Court rejected this distinction, noting the distinction

---

[20] https://www.plansponsor.com/congress-urged-act-soon-union-pension-funding-crisis/

had proved "impossible to draw with precision," and that subsequent cases have eroded its underpinnings. In sum, because *Janus* found no distinction between compelled dues for chargeable and non-chargeable purposes, this Court should reject Defendants' invitation to allow forced payments into funds Defendants view as non-political.

## CONCLUSION

The motions to dismiss should be denied.

DATED:  July 12, 2019.

Respectfully submitted:

By ___ s/ Wencong Fa _____
**WENCONG FA** (Cal. Bar No. 301679)*
**DAMIEN M. SCHIFF**
(Cal. Bar No. 235101)*
**ANASTASIA P. BODEN**
(Cal. Bar No. 281911)*
**ETHAN W. BLEVINS**
(Utah Bar No. 16784)*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: WFa@pacificlegal.org
Email: DSchiff@pacificlegal.org
Email: ABoden@pacificlegal.org
Email: EBlevins@pacificlegal.org

**THOMAS R. REVNEW**
(SBN 0295620)
**WILLIAM E. PARKER**
(SBN 0390984)
*Local Counsel*
Seaton, Peters, & Revnew
7300 Metro Blvd. Suite 500
Minnesota, MN 55439
Telephone: (952) 921-4622
Fax: (952) 896-1704
Email: trevnew@seatonlaw.com
Email: wparker@seatonlaw.com

*Counsel for Plaintiffs Associated Builders and Contractors Inc.,
Minnesota/North Dakota Chapter, et al.*

*\*Pro Hac Vice Admission*

## CERTIFICATE OF COMPLIANCE

I, Wencong Fa, certify that the memorandum titled: PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS complies with Local Rule 7.1(f) and (h).

I further certify that, in preparation of the above document, I used the following word processing program and version: Microsoft Word 2013 and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above document contains 11,195 words.

I further certify that the above document is in a 13-point, proportional font and is double-spaced, except where permitted by the Local Rules.

DATED:  July 12, 2019.

Respectfully submitted:

By ___s/ Wencong Fa_____
**WENCONG FA** (Cal. Bar No. 301679)*
**DAMIEN M. SCHIFF**
(Cal. Bar No. 235101)*
**ANASTASIA P. BODEN**
(Cal. Bar No. 281911)*
**ETHAN W. BLEVINS**
(Utah Bar No. 16784)*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

**THOMAS R. REVNEW**
(SBN 0295620)
**WILLIAM E. PARKER**
(SBN 0390984)
*Local Counsel*
Seaton, Peters, & Revnew
7300 Metro Blvd. Suite 500
Minnesota, MN 55439
Telephone: (952) 921-4622
Fax: (952) 896-1704
Email: trevnew@seatonlaw.com
Email: wparker@seatonlaw.com

*Counsel for Plaintiffs Associated Builders and Contractors Inc.,
Minnesota/North Dakota Chapter, et al.
*Pro Hac Vice Admission*

- 42 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2019, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

Wencong Fa
WENCONG FA
